# CAMPBELL v. NORTHWEST ECKINGTON. IMPROVEMENT COMPANY.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 251. Argued April 23, 24, 1913.—Decided June 9, 1913.

A deed for an undivided interest in unimproved real estate heavily encumbered given to a third party in pursuance of prior agreements to undertake to aid in the financial and practical development of the property *held* to have been given for the undertaking and not for the performance and to have presently vested the grantee with the interest conveyed absolutely as stated on its face and not by way of security only.

The burden is on the complainant seeking to give a different effect to a deed than that of its face and where the bill does not waive an answer under oath, and defendant does answer under oath, weight must be given to the answer. *Vigil v. Hopp,* 104 U. S. 441.

To justify the setting aside of a solemn instrument of conveyance deliberately made by parties *sui juris* and giving it an effect different from its plain purport, the evidence should be clear, unequivocal and convincing. *Maxwell Land Grant Case,* 121 U. S. 325, 381.

An agreement to give skill and experience as a builder and contractor does not necessarily imply that he is to personally act as superintendent of construction; nor, under the circumstances of this case, should his accounts be surcharged with the amounts paid for wages to a superintendent employed by him.

One, who under an agreement is to be reimbursed for his outlay, should keep proper account of his receipts and disbursements and preserve the vouchers therefor.

36 App. D. C. 149, reversed.

THE facts, which involve the construction of contracts relating to, and rights of co-adventurers in, a real estate enterprise in the District of Columbia, are stated in the opinion.

*Mr. John Ridout* for appellant.

*Mr. Holmes Conrad*, for appellees, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

This appeal brings under review a decree of the Court of Appeals affirming a decree of the Supreme Court of the District of Columbia that declared a deed of conveyance, absolute on its face, made by the Northwest Eckington Improvement Company to Charles M. Campbell, to have been intended only to secure to Campbell his share of the profits of an enterprise previously undertaken by the parties to the action for the development of the lands described in the deed. The decree also canceled the contracts between the parties respecting the enterprise, settled an account between them, decreed that Campbell should pay a certain sum found due from him on balance, required him to reconvey the land, and granted incidental relief. The decree thus affirmed was rendered pursuant to the mandate of the Court of Appeals upon the reversal of a former decree which was in Campbell's favor. The successive decisions, so far as reported, are to be found in 28 App. D. C. 483 (35 Wash. Law. Rep. 62); 38 Wash. Law Rep. 79; 36 App. D. C. 149 (39 Wash. Law Rep. 69).

The present appellant assails the decree in respect of its main features, and also in respect of the principle adopted in the accounting. A somewhat particular recital of the facts in evidence, with the grounds of decision in the courts below, seems to be called for.

In the year 1902, The Eckington Company held the legal title to a tract of land lying in a suburb of Washington, containing about ten and a half acres. The appellees, Daniel and Redman, were the owners and holders of practically all the stock in the company, and had entire

charge of its affairs. Redman was President, and Daniel, Secretary; Daniel, with Redman's assent, represented the latter, and also the company, in the various transactions out of which the controversy arises. The property was unimproved and unproductive, and its value problematical. It was encumbered with a deed of trust, held by a Mrs. Franz, given to secure promissory notes of Daniel, upon which approximately $32,000 were due. Interest and taxes were in arrears. In the early part of the year negotiations took place between Daniel and Redman, on the one hand, and Campbell, the appellant, on the other, with the object of interesting Campbell, who was a builder and a manager of real estate developments, and as a result a written agreement was made between them, of which the following is a copy:

WASHINGTON, D. C. *March 13, 1902.*

Whereas T. C. Daniel and S. C. Redman, of Washington, D. C., acting for themselves and the Northwest Eckington Improvement Co., of the District of Columbia, a corporation incorporated under the laws of the State of Virginia, are owners of a certain tract of land in northwest Eckington subject to trust interest and taxes fully described by the plats and printed matter of the above Company, consisting of ten and a half acres more or less, desire to dispose of the same, they hereby agree with C. M. Campbell, of Washington, D. C., in consideration of one dollar in hand paid by him, and other valuable consideration, that if he will organize or be instrumental in organizing a company, even with the assistance of T. C. Daniel or others, for the purchase of said ground, and give the necessary time and attention to that end, they agree, in case his plans work out so that they accept the consideration said Company offers for said ground, to give him a third of the amount they receive, whether of money, stock or property, and that in the event of such sale or disposition of said property he is to become

possessed of an undivided one-third interest in the property. In case less than the whole tract is sold then said Campbell is to become possessed of an undivided one-third interest in the amount sold.

Northwest Eckington Improvement Co. [Seal.]
　　　　　　T. Cushing Daniel.　[seal.]
　　　　　　Samuel C. Redman.　[seal.]
　　　　　　C. M. Campbell.　　[seal.]

Approved and accepted.

Northwest Eckington Improvement Co.
S. C. Redman, Prest.　T. C. Daniel, Scc."

Pursuant to this agreement, Campbell caused a corporation to be formed, with the title of "Washington Sanitary Dwellings Company," and endeavored to sell enough of its stock to provide for taking over the property and constructing sanitary dwellings thereon for workingmen and their families.

Mrs. Franz was pressing for money, and, in order to satisfy her, Campbell agreed to pay her, and did pay her, $500 on account of the amount due upon the deed of trust, and at the same time a memorandum was signed, of which the following is a copy:

Washington, D. C., June 19th, 1902.

Whereas a certain agreement was entered into March 13, 1902, between T. Cushing Daniel, S. C. Redman and C. M. Campbell, which agreement was accepted by the Northwest Eckington Improvement Co., now this further memorandum witnesseth: That the Company which said Campbell agreed to organize, as stipulated in said agreement, has been organized to our satisfaction; that the deed conveying said property to said Company has been prepared and properly executed and that the five hundred dollars which said Campbell this day advances to meet the requirements of the holder of the deed of trust on said property, is done upon acceptance of the above facts. Said transfer will be made upon the terms of acceptance noted

in the minutes of the Sanitary Dwellings Co., which are accepted. *Any monies advanced by said Campbell in handling the property in question shall be returned* returned *to him out of first sales.*

And all rights of said Campbell under said agreement of March 13, 1902, shall remain unimpaired.

[SEAL.]          T. C. DANIEL,
[SEAL.]          C. M. CAMPBELL.
                 NORTHWEST ECKINGTON IMPROVEMENT
                 COMPANY,
        —— ——, *President.*  T. C. DANIEL, *Sec'r.*"

According to Campbell's testimony—undisputed so far as we have observed—the clause italicized was inserted by Daniel in his own handwriting in order to emphasize the assurance that Campbell was to have rights prior to the others to the extent of reimbursement of his advances. The paper was not signed by Redman, nor formally by the company—a matter that is of no present consequence in view of its subsequent recognition.

Besides the $500 paid to Mrs. Franz, Campbell paid out in June $122.91 for taxes upon the property, and during the spring and summer incurred expenses aggregating $481.81 in organizing and promoting the Washington Sanitary Dwellings Company. Daniel himself, called as a witness for the complainants, testified upon the subject as follows: "Mr. Campbell worked on the sale of stock in the company; employed others to assist him in placing the stock, but after finding that he could not make it a success he admitted the same to me and asked whether something could not be done to save the $1,000 that he had spent in that effort; we then agreed to abandon the Sanitary Dwellings enterprise." After some discussion the parties, under date of October 23, 1902, entered into a further agreement in writing of which the following is a copy:

"Whereas a contract was entered into March 13, 1902,

between T. C. Daniel and S. C. Redman and the Northwest Eckington Improvement Co., a corporation, and C. M. Campbell, stipulating for the services of said Campbell, it is further agreed, while preserving to said Campbell any rights he may have under said contract, as follows:

"1. In consideration of the services of said Campbell has already performed and for the purpose of securing his further services and co-operation in the handling and improvement of said property, it is agreed to make certain extension of the provisions of said contract.

"2. It is now decided to release the Sanitary Dwellings Company, if necessary, from any obligations, it may have assumed in regard to any agreement to purchase said property.

"3. The said Daniel, Redman and the Northwest Eckington Improvement Company have decided to improve and market said property, as fast as may be possible, by building houses thereon.

"4. To this end they desire to utilize the skill of said Campbell as a builder and his assistance financially.

"5. It is agreed by said Daniel, Redman and the Northwest Eckington Improvement Company to employ said Campbell as a skilful builder in the erection of said houses, he to take charge of said work, with such assistance as the other parties to this contract may be able to furnish, and pursue such work industriously and with all the ability and skill he can bring to the work.

"6. In the borrowing of the money that may be needed in developing said enterprise he is to use his credit by joining the other parties to this contract in the making or endorsing of any notes that may be required in negotiating the necessary loans for the making of said improvements and in paying off the loan of $32,000 now due on said property. In doing this account is to be taken of all moneys and interest he has already advanced under contracts in

relation to said property already entered into between the parties hereto. And any sums advanced or to be advanced by any of said parties for the same purpose under said agreements is likewise to be accounted for.

"7. It is proposed to erect at once five houses on said property and follow them with others as soon as such a course is warranted by the results and approved by the judgment of the parties to this agreement, said Campbell to industriously push said improvements with his best skill and ability, as provided in paragraph 5 herein, without any further compensation for his services than are provided for herein.

"8. In return for said undertaking on said Campbell's part he is to become possessed of an undivided one-third interest in said property.

Witness our hands and seals this 23rd day of October, 1902.

> NORTHWEST ECKINGTON IMPROVEMENT CO.,
> By SAMUEL C. REDMAN, *Pres.*
> THOS. C. DANIEL, *Sec'y.*
> SAMUEL C. REDMAN.
> T. C. DANIEL.
> C. M. CAMPBELL."

The execution of this instrument, at least by the Eckington Company, appears to have been deferred until the latter part of the month of November, awaiting its approval by a stockholders' meeting. Shortly afterwards, and in order to carry out the provisions of the seventh paragraph, an agreement in writing was made under date December 2d between the individuals Daniel, Redman, and Campbell, of the one part, and Mrs. Franz, of the other, whereby the amount due upon the promissory notes of Daniel secured by her deed of trust was ascertained at $32,938.66; she agreed to release a plot sufficient for five houses on payment of a specified consideration, to be credited as part payment upon the notes; they agreed to

erect five substantial brick dwellings, to cost not less than $3,000 each, and pay off the taxes on the entire property; and they (including Campbell, who was not until then personally responsible to Mrs. Franz), guaranteed the payment of the balance remaining due upon the promissory notes, when and as they should respectively become due; but it was agreed that upon the making of the part payment provided for, the time for payment of the balance was to be extended for two years.

Pursuant to this, the plot upon which the five houses were to be built was released by Mrs. Franz from the deed of trust, and conveyed by the Eckington Company to Daniel, Redman and Campbell as individuals, and they placed upon it a new mortgage for the amount of $12,500, paying a part of this money to Mrs. Franz as consideration for her release, and placing the residue of the loan at the disposal of Campbell, to be used in the construction of the houses.

Under the agreement with Mrs. Franz, Campbell found it necessary to pay $957.55 for the taxes upon the entire property, and this he paid from his own funds on December 8. This, with some small items that need not be specified, added to his expenditures prior to October 23, already mentioned ($500 to Mrs. Franz, $122.91 for taxes, and $481.81 advanced on behalf of the Sanitary Dwellings Company enterprise), made an aggregate of $2,094.62. Campbell became uneasy respecting his position in the matter, and an agreement was drawn up by his counsel, bearing date December 10, 1902, for execution by the Eckington Company, and by Daniel, Redman, and Campbell as individuals, and was tendered by Campbell to Daniel for the purpose; which paper, after a preamble that recited the agreement of October 23d, contained a repetition of the provisions of that agreement, with the addition of several clauses, by one of which "The Eckington Company agrees to execute at once a conveyance of said un-

divided one-third interest to said Charles M. Campbell in fee simple."

This instrument was never executed, and, after some further discussion, the deed in question was prepared and presented by Campbell to Daniel. The latter testified: "He [Campbell] said, that Mr. Ridout had drawn that contract up for him, and he did not see any reason why we should not sign. I read it over pretty carefully, and when I saw that it was a deed for a one-third undivided interest, I knew or thought that it tied Mr. Campbell to the proposition so that he could not get any way of deeding that third interest away until he had earned it by the carrying out of his contract, and, thinking it over, it seemed to me that it would be a rather reasonable request, if he was going to put in a great deal of money to build up that entire property, and I thought he should have insisted upon some security on the record; I think I would have insisted upon something like that myself, and it was a business proposition, and I submitted it to Mr. Redman and told him I did not think there was anything wrong about it—(interrupted)—I told Mr. Campbell after thinking it over, I would be perfectly willing to execute that as security to him, to protect him. . . . At that time I believed that he was going to carry out the contract, and it would be all satisfactory."

The deed was actually executed and delivered on January 16, 1903, and thereby the Northwest Eckington Improvement Company, for "divers valuable considerations, and the sum of ten dollars," conveyed to Campbell, his heirs and assigns, an undivided one-third interest in the property in question, excepting the portions theretofore conveyed. It contained a special warranty excepting recorded encumbrances.

Before the first five houses were completed, and in the spring of 1903, the parties proceeded with the construction of another row of five houses under an arrangement similar

to the former one, including a building loan to pay the cost of construction, the proceeds (over and above the amount necessary to procure the release from the deed of trust) being placed in Campbell's hands. While matters were thus progressing, and when the first five houses were nearly or quite completed, the opportunity was offered to dispose of a considerable plot of the unimproved land to one Malnati, and the sale was made in November, 1903, and consummated during the following month, at the price of $15,200; a price evidently deemed highly favorable by the owners. Of the proceeds, $6,000 were paid on the Franz mortgage and the taxes. Before the sale was consummated Campbell demanded that out of the balance he should be paid a sum approximating $4,000 for what was due to him for advances on the joint account, including the $2,094.62 that he had expended prior to the making of the deed and the excess cost of the ten houses to date, over and above the proceeds of the building loans. Campbell's position seems to have been that the agreement expressed in the memorandum of June 19, 1902, to the effect that all moneys advanced by him in handling the property should be returned to him out of the first sales, was still in force; and that as the sale to Malnati was the first sale, he was entitled to be reimbursed out of the proceeds in order to put him upon an equality with the others, who had advanced nothing or practically nothing. Daniel resisted Campbell's demand, his view being that the June memorandum was superseded in this respect by the sixth clause of the October agreement, and that while "account was to be taken" of Campbell's advances, they were not to be returned to him out of the first sales. Daniel asked Campbell for an accounting and an informal account was rendered, to which Daniel made objections on the ground that it was unaccompanied with vouchers; and an arrangement was made whereby $4,000 of the proceeds of the sale to Malnati were left in the hands of

a third party to await the settlement of the controversy, and the balance was divided, one-third to Campbell and the remainder to the Eckington Company.

The controversy continued, however, with increasing acrimony until February 8, 1904, when the appellees filed in the Supreme Court of the District their present bill in equity against Campbell, setting up the history of the above transactions from their standpoint, and asserting that the deed of January 16, 1903, was given not as an absolute conveyance, but by way of security. The bill further alleged that he had failed to perform his obligations under the contract of October 23, 1902, had involved the complainants in debt, refused to inform them as to the cost of buildings, or in any satisfactory manner to account for the large sums of money placed at his disposal for the building operations, and threatened to embarrass complainants in making any disposition whatever of the property, etc. The prayer was that Campbell be required to account; that all contracts between the parties be canceled; and that he be required to reconvey to the Improvement Company the undivided third interest conveyed to him by that company.

Campbell answered under oath, denying that the conveyance was intended as security, and averring that the complainants had recognized his right to such a conveyance, and that it was made to convey absolute title to him in consideration of his undertakings, set out in the agreement of October 23, 1902, and the other agreements between the parties.

Voluminous testimony was taken on both sides, the essence of which we have endeavored to state, and the cause was brought on to a hearing before the Supreme Court. That court, by Mr. Justice Anderson, delivered an opinion reviewing the history of the transactions, the successive written agreements between the parties, and the evidence respecting various items of disbursement claimed to have

been made by Campbell, and claimed by the complainants not to have been satisfactorily accounted for by him. Upon the principal issue the view of the court was expressed as follows:

"Coming now to the specific question whether the deed to Campbell was intended to be absolute or merely as security, there are but two witnesses testifying about it. One is Daniel, who says that it was understood to be only as security, and that thereafter in July 1903 Campbell for the second time presented the proposed contract of Dec. 10, 1902, providing for a conveyance to him of an undivided third interest in fee simple, and said that his attorney advised that it be executed. The other is Campbell, who says that the deed was intended to be absolute, and that the proposed agreement of Dec. 10, 1902, was never presented to Daniel after the execution of the deed. In this state of the case, it may be inquired what light the circumstances of the case throw upon this question; but such inquiry would seem rather to bear out, if anything, the position of Campbell than that of Daniel. Campbell and the other parties went into the joint enterprise to endeavor by their conjoint efforts to make something out of a piece of property which was heavily encumbered and becoming more and more encumbered every day, because it could not take care of the fixed charges upon it continually arising. They all recognized that something might be made out of the property, if diligent effort was made to develop it, but the hope of making anything out of it seemed to reside more in diligent efforts to be made than in the property itself. Accordingly, the joint enterprise was undertaken. They all joined together, Campbell being joined because of his skill as a builder in addition to his general business ability and the assistance which he might give, together with the others, in the way of making and endorsing notes; and the other parties being joined to contribute to the enterprise the property which

it was sought to so develop as to make it a success, instead
of the failure which it had theretofore been, as also to con-
tribute their general business ability.  In such an arrange-
ment it certainly was not unreasonable to give Campbell
a status as the owner of an undivided interest in the enter-
prise.  On the contrary, it would have been rather unusual
and unreasonable to treat him in any other manner, be-
cause he was, by virtue of the contract, made a sharer in
the failure as well as in the success of the enterprise.  He
stood to lose as well as to gain, and in the event of loss,
nothing whatever could be reaped by him for his contribu-
tion of skill and money.

"But even if the circumstances in the case could be
construed as in some manner tending to support the posi-
tion of the complainants, certainly it could not be said
that they are of a strength equal to the testimony of a
witness, which would be required in order to establish the
complainants' position, they not having waived by their
bill answer under oath, and the defendant having answered
under oath.  *Vigel* v. *Hopp*, 104 U. S. 441."

The court therefore held that the prayers of the bill
asking that the deed to Campbell be declared to be a
security merely, and that the contracts be canceled, should
be denied; and that the cause should be referred to the
Auditor for a full accounting respecting the affairs of the
joint enterprise, including that portion relating to the
Sanitary Dwellings Company.  A decree was entered
accordingly, bearing date January 4, 1906.

The complainants appealed, and the Court of Appeals
(28 App. D. C. 483) held that the deed of January 16,
1903, was not absolute, but intended merely as security
for Campbell in the event of his performance of the agree-
ment of October 23, 1902.  The decree of the Supreme
Court, so far as it denied the prayers for a cancellation of
the agreements and a reconveyance from the defendant,
was reversed, and the cause remanded with direction to

enter a decree declaring the true intent and purpose of the deed of January 16, 1903, to be as indicated in the opinion of the Court of Appeals.

That court, while conceding the evidential weight of Campbell's sworn answer, under the rule laid down in *Vigel* v. *Hopp*, 104 U. S. 441, differed from Mr. Justice Anderson in his view of the circumstances surrounding the transaction under inquiry. The liberal terms conceded to Campbell in the agreement of March 13, 1902, were attributed to the fact that the complainants were then apprehensive of the foreclosure of the mortgage upon the land. The view was expressed that the condition of the property had greatly improved during the succeeding months, on account of certain railroad developments; that the parties were agreed as to the reasonable prospect of building houses thereon and securing income therefrom; that it was apparent the cash value of the land had advanced considerably beyond the amount of the Franz mortgage, and apprehension of its loss by foreclosure was greatly if not entirely relieved; that Campbell submitted estimates for the erection of as many as forty houses, and the probable income therefrom, as indicating successful development in that way; and the parties then entered into the contract of October 23, 1902. The opinion proceeds (28 App. D. C. 494):

"The legal effect of this contract was to make the complainants partners with Campbell in the development of the land by building houses; they furnishing the land and Campbell undertaking the erection of the houses. All were to join in using their credit in obtaining money to erect houses, and pay off the $32,000 encumbrance; and the sums advanced by the respective parties were to be accounted for. Five houses were to be erected at once, to be followed by others if results were approved. The last paragraph of the agreement was that 'in return for said undertaking on said Campbell's part he is to become

possessed of an undivided one-third interest in said property.' Clearly this did not contemplate that Campbell should at once become the absolute owner of this one-third of the land. It was necessarily conditioned upon the terms of his undertaking, before recited in the contract. He had no immediate right to demand a conveyance thereunder, and none when the deed was actually executed and delivered to him on January 16, 1903. Complainants contended that this deed was made, at Campbell's request, to secure him in his rights under the contract."

And again (p. 496):

"When the deed was executed, on January 16, 1903, it is not pretended that there was any new consideration for its execution. It was founded wholly upon the provisions of the contract of October 23, 1902, no matter what may have been the private opinion of the respective parties as to Campbell's rights thereunder; and its meaning, purpose, and effect are determined thereby.

"The difficulty attending the correction of a deed or instrument carrying into effect a previous parol agreement is obviated when it appears to have been prepared and executed in pursuance of a written agreement. When it appears that the instrument intended to give effect to a written agreement is inconsistent with its terms there is a manifest equity to correct the error. Adams, Eq. 169; *Elliot* v. *Sackett*, 108 U. S. 132, 141.

"As before stated, there is nothing which tends to show that Campbell was to become the absolute owner of one-third of the complainants' land without regard to the performance of the joint undertaking contemplated in the contract of October 23, 1902. It is true that contract is inartificial and somewhat vague, but no such meaning can be imputed to it.

"In the light of the circumstances pointed out, we can come to no other conclusion than that complainants' statement of the purposes of this deed is the correct one.

They represent it as given to secure Campbell in their performance of the contract. It was not a security, or an additional security, in the ordinary sense, but it did make Campbell secure, in the case of his endeavor to carry out that contract, by giving him at once the conveyance that he might thereafter become entitled to, and enabling him, by its registration, to give notice of his rights under the contract, to all persons who might thereafter acquire any interest from the complainants.

"The decree, in so far as this conveyance is concerned, is interlocutory in its nature, and for the guidance of the auditor in stating the account between the parties, and, instead of virtually establishing it as an absolute deed, should have declared it to be merely a conditional one dependent upon the performance of the agreement in accordance with which it was made. The question whether it shall be canceled is a final one that can only be properly determined upon the coming in of the auditor's report with the account that has been ordered to be taken by him."

Upon the going down of the mandate, the Supreme Court entered an interlocutory decree in accordance with it, and thereafter the hearing before the Auditor proceeded; but the accounting was made, or at least attempted to be made, not upon the original theory of a joint ownership in the property, but upon a theory of the rights of the parties under the agreement of October 23, 1902, that resulted from the decision of the Court of Appeals.

The Auditor stated an account charging the defendant with his actual receipts from the proceeds of the building loans, and from other sources connected with the enterprise, and giving him credit for his expenditures for construction and payments made to the complainants. An elaborate report was made, to which exceptions were filed by the complainants, and these the Supreme Court sustained in part and overruled in part, reserving certain of

the questions for disposition on the final hearing, and meanwhile ordering the Auditor to restate the account, which was done, and to this second report both parties took exceptions.

The case then came on for final hearing before the Supreme Court upon the whole record, including the pleadings, the evidence, and the exceptions. Respecting the disputed matters in the accounting, we need say no more than that the court sustained Campbell's right to credit for the $500 paid by him to Mrs. Franz in June, 1902, and $122.91 paid about the same time for taxes, but overruled his claim for an allowance of the $481.81 paid on account of the Sanitary Dwellings Company, upon the ground that this expenditure was made for his own account and at his own risk, and had not benefited the common enterprise.

Upon the main questions the court (38 Wash. Law Rep. 79), following the lines laid down in the opinion of the Court of Appeals, held as follows:

(1) That the deed of January 16, 1903, was not intended to convey a present absolute title, but was only to secure the defendant his share of the profits of the enterprise when he should perform his share of the work of building houses and making sales; and that to the extent that he had performed his contract obligations, the security should be kept intact;

(2) That as to the ten houses and the land on which they stood, the defendant had an undivided one-third interest under the two deeds executed to him and to the complainants Daniel and Redman, that title being absolute, subject to encumbrances;

(3) That the contracts which were executed between the parties plaintiff and defendant ought to be canceled, because there was no prospect of any amicable continuation of operations under them, even if there were any desire by either party to continue;

(4) That the defendant should reconvey to the Eckington Company the title received from it by the deed of January 16, 1903, on being paid or satisfactorily secured what, if anything, remained due to him on settlement of accounts on the lines previously indicated;

(5) That if the defendant had become bound to pay any portion of the encumbrance on the unimproved land held by Mrs. Franz, the complainants should either obtain his release therefrom or indemnify him against the same.

This result was carried into the final decree, with a variance that is unexplained by anything in the opinions, or elsewhere in the record, so far as we have observed, viz., the decree subjects Campbell's interest in the ten houses to a charge in favor of Daniel and Redman of $1,237.65, "being the balance due by him on his one-third of the excess cost of building said houses and obtaining a release of the said ten lots from a mortgage or deed of trust thereon known as the Franz mortgage or deed of trust, over and above the money obtained for this purpose by loans secured by Daniel, Redman and Campbell." Perhaps it was intended to charge Campbell's interest in the ten houses, in favor of his co-tenants, with a sum found to be due upon the theory of accounting that resulted from the decision of the Court of Appeals.

The defendant Campbell appealed to the Court of Appeals, where the decree was affirmed, the court adhering (36 App. D. C. 149) to its former view. As to the item of $481.81, the court expressed concurrence with the view of the Supreme Court, saying: "This item benefited the complainants in no way, and we do not think its repayment was contemplated by the October contract."

Upon the main question, the court treating the deed of January 16, 1903, as given only to secure Campbell for his share of the profits when he should perform his part of the agreement, proceeded to consider the question of his conduct after the making of the deed. The court found him

at fault, because he stopped when ten houses were constructed, although the income upon them was not sufficient to liquidate the fixed charges upon the balance of the property. · It was in effect held that he was at fault in employing a superintendent of construction, and in failing to keep careful accounts of receipts and expenditures, and preserve all vouchers. His conduct in demanding reimbursement of the moneys he had advanced, and a third of the net proceeds, upon the sale to Malnati, "although under his contract he was fully protected," was characterized as arbitrary, as was his receipt of one-third of the balance, "when that sum, as he was informed and had every reason to know, was needed to develop the remaining land." His conduct after the Malnati sale was likewise criticised, and the opinion concludes (36 App. D. C. 158):

"From a careful examination of the entire record, we are forced to the conclusion that the decree was right. It is difficult to perceive wherein the defendant has been injured. He was to receive a one-third interest in certain property upon the theory of services performed in the improvement and sale of that property. To the extent that he has performed the obligation imposed upon him by the contract, his interests have been fully protected by the decree: more he has no right to expect, and more a court of equity certainly ought not to award him."

From our examination of the record, we are constrained to the view that the Court of Appeals erred in adjudging that the deed in question was given as security merely, and not as an absolute conveyance. The court conceded that the burden was upon the complainants to prove that this instrument did not express the intention of the parties at the time, and that if the general rule laid down by this court in *Vigel* v. *Hopp,* 104 U. S. 441, were applicable, the bill must in that respect be dismissed. The opposite conclusion was reached in view of the circumstances

surrounding the transaction, and because of the construction that the learned court placed upon the contract of October 23, 1902.

We place a different construction upon that contract, and also take a different view of the circumstances under which it was made. Avoiding repetition so far as possible, our view may be expressed as follows:

We agree that the legal effect of this contract was to make the complainants in effect partners with Campbell in the development of the land by building houses, they furnishing the land and he undertaking the erection of the houses. But it seems to us that the agreement recognized that the joint enterprise had commenced in March and had continued ever since; and that Campbell was not only entitled to consideration for the services he had "already performed"—that is, for what he had done under the March agreement—but was entitled to reimbursement for whatever money he had advanced, with interest on those moneys.

The March agreement shows upon its face (and all the circumstances corroborate this) that the prime object of the parties was to dispose of the property, and that the particular method of disposing of it was not of the essence of the matter. This is plain from the language—"That if he [Campbell] will organize or be instrumental in organizing a company, even with the assistance of T. C. Daniel or others, for the purchase of said ground, and give the necessary time and attention to that end, they agree, in case his plans work out so that they accept the consideration said company offers for said ground, to give him a third of the amount they receive, whether of money, stock, or property, and that in the event of such sale or disposition of said property he is to become possessed of an undivided one-third interest in the property. In case less than the whole tract is sold then said Campbell is to become possessed of an undivided one-third interest

in the amount sold." This agreement is inartificially expressed, and requires construction. It was hardly intended that Campbell should have one-third of the consideration received by the vendors, and also an undivided one-third interest in the property. Neither did it mean that in case less than the whole tract should be sold he was to become possessed of an undivided one-third interest in the land sold. What it meant was, that he should have, directly or indirectly, one-third interest in the proceeds of the property. In short, he was to be a "partner" in the enterprise.

The court seems to have considered that this agreement virtually expired with the failure of the scheme for financing the Sanitary Dwelling Company. We do not so regard it. The conduct of the parties from March until October, the wording of the memorandum of June 19th, the negotiations leading up to the abandonment of the Sanitary Dwellings Company scheme, and the making of the October agreement instead—one of the inducements to which, according to complainants' uncontradicted evidence, was to enable Campbell to recoup the money he had expended on the Sanitary Dwellings Company—and finally the language of the October agreement, all go to show that the main purpose, and the association of the parties to accomplish it, were never abandoned.

We do not think this agreement can be properly considered as foreclosing all rights that Campbell had under previous agreements, saving as expressly reserved. By its terms, after reciting the contract of March 13, it declared: "It is further agreed, *while preserving to said Campbell any rights he may have under said contract,* as follows: 1. In consideration of the *services said Campbell has already performed,* and for the purpose of securing his further services and coöperation in the handling and improvement of said property it is agreed to make cer-

tain *extension of the provisions of said contract.*" Then
follow the clause providing for a release of the Sanitary
Dwellings Company; the recital of the purpose to improve
and market the property as fast as possible by building
houses upon it, the desire to utilize the skill of Campbell
as a builder, and his assistance financially, the agree-
ment that he is to "take charge of said work, with such
assistance as the other parties may be able to furnish;"
that in borrowing the money needed for developing the
enterprise he is to use his credit by joining with the
other parties in making notes, etc., for the necessary
loans; and that "in doing this, *account is to be taken of
all moneys and interest he has already advanced under con-
tracts in relation to said property already entered into be-
tween the parties hereto.* And any sums advanced or to be
advanced by any of said parties for the same purpose
under said agreements is likewise to be accounted for."
The seventh clause is: "It is proposed to erect at once
five houses on said property and follow them with others
as soon as such a course is warranted by the results and
approved by the judgment of the parties to this agree-
ment, said Campbell to industriously push said improve-
ments, etc., without further compensation for his services
than are provided for herein." And 8: "*In return for said
undertaking on said Campbell's part he is to become possessed
of an undivided one-third interest in said property.*"

The agreement reads plainly that Campbell was to have
this interest in the property, not for performance, but for
*his undertaking.* In short, as we think, he was to be
presently vested with a one-third interest in the equity
of the property, and to be thereby put upon an equal
footing with Daniel and Redman, who through their
stock interest in the Eckington Company would be
entitled to a two-third's interest.

The view adopted by the court below would leave
Campbell's position—he being the only one of the party

able and willing to advance cash for the development of the enterprise—altogether precarious. It was in contemplation that the expenditures made by him should be made for the common benefit, and that the property would be enhanced in value if the enterprise proved successful. And it seems most improbable that he should be willing to devote his time and experience, and also pledge his credit to the extent necessary to pay off the existing loan of $32,000, and whatever more was needed to put up the houses, and await a successful outcome before being assured of his reward.

Besides, the undertaking would not be fully completed *until the property had been marketed;* that is, had passed into the hands of third parties. How could he then "become possessed" of an undivided one-third interest in it?

It is not strange that Campbell very shortly found that his position was insecure without a deed that should vest in him the legal title to the undivided one-third. Shortly after the execution of the agreement of October 23d, he began to insist that his rights under it should be secured to him. The proposed agreement of December 10, 1902, was submitted and rejected. Afterwards, and in response to his insistent demands, the deed in question was made and delivered to him in January. For a sufficient consideration, it is not necessary to look beyond the situation evidenced by the agreement of October 23d; for it seems to us that the act of the parties in making the deed is clearly in accord with the view we take of that contract, and amounted to a practical interpretation of it; the purpose in making the deed being to simply put into legal form what equity would perhaps have required to be done for carrying that contract into effect.

If we need to look elsewhere for the intent of the parties, then in addition to the rule respecting the weight that shall be given to a sworn answer in Chancery, invoked

and relied upon in *Vigel* v. *Hopp*, 104 U. S. 441, and in numerous other cases—*Union R. R. Co.* v. *Dull*, 124 U. S. 173, 175; *Southern Development Co.* v. *Silva*, 125 U. S. 247, 249; *Beals* v. *Illinois &c. R. R. Co.*, 133 U. S. 290, 295; *Monroe Cattle Co.* v. *Becker*, 147 U. S. 47, 54—this case is a proper one for the application of the well-known principle that to justify the setting aside of a solemn instrument of conveyance, deliberately made by parties *sui juris*, and the giving to it of an effect different from its plain purport, the evidence should be clear, unequivocal, and convincing. *Maxwell Land-Grant Case*, 121 U. S. 325, 381. The evidence of the complainants does not, we think, measure up to the standard.

The result of these views is that the decree, in so far as it sets aside the deed of January 16, 1903, as being merely conditional and dependent upon performance by Campbell of the agreement of October 23, 1902, should be reversed, because the deed must be held to be, what it purports to be, an absolute conveyance.

For the same reasons the decree, so far as it cancels the contracts of March 13, 1902, and of October 23, 1902, should be reversed.

The original prayer of the complainants for an accounting should be sustained; but the accounting should be made upon the basis of the agreement; Campbell and the others being treated as *quasi*-partners respecting the improvement and marketing of the property in question from the making of the agreement of March 13, 1902. He should be charged with all moneys received by him as proceeds of loans or otherwise, and, on the other hand should be credited with whatever he has fairly and properly expended for the common enterprise, whether the particular expenditure can be shown to have ultimately profited the enterprise or not. This includes the $481.81 disbursed on account of the Sanitary Dwellings Company, and other expenditures made under the agreement of

March 13, 1902; his right thereto being preserved by the contract of October 23d, as moneys "advanced under contracts in relation to said property already entered into between the parties hereto;" and, under the same clause, he is entitled to interest upon his advances.

We need not pass upon other questions raised respecting the accounting, except to say that we of course do not agree with the view expressed by the Court of Appeals respecting the conduct of Campbell subsequent to the making of the deed. The court deemed that in employing a superintendent of construction he violated the letter or spirit of the contract of October 23d. That agreement contemplated that his skill as a builder, and his assistance generally, should be utilized, and he was to take charge of the work, with such assistance as the other parties might be able to furnish. It does not necessarily follow that he was personally to fill the place of superintendent of construction. It is of course true that Campbell ought to have kept a proper account of his receipts and disbursements, and so far as he failed to do this or to preserve proper vouchers, the matter may be dealt with on the accounting according to the usual principles.

*The decree of the Court of Appeals reversed, with costs in this court and costs of both appeals in the Court of Appeals; and the cause remanded with directions to reinstate and affirm the decree of the Supreme Court of the District of Columbia bearing date January 4, 1906, and to reverse and set aside all subsequent decrees so far as inconsistent therewith, and remand the cause to said Supreme Court with directions to proceed to an accounting between the parties, or a revision of the accounting already had in that court, and further proceedings thereon as equity may require, and in accordance with the views above expressed.*