### GREENFIELD v. BLUMENTHAL.
### No. 5204.

Circuit Court of Appeals, Third Circuit.

Jan. 12, 1934.

George Wharton Pepper, Stanley Folz, and William B. Bodine, all of Philadelphia, Pa. (Sundheim, Folz & Sundheim and Pepper, Bodine, Stokes & Schoch, all of Philadelphia, Pa., of counsel), for appellant.

Robert T. McCracken, C. Russell Phillips, and Roy M. Livingstone, all of Philadelphia, Pa., for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

In the court below Alfred C. Blumenthal, after final hearing, was awarded $151,575, together with interest thereon from October 16, 1930, to the date of payment, against Albert M. Greenfield. The claim of Blumenthal was based on an alleged contract of Greenfield to pay Blumenthal one-half of commissions alleged to have been paid Greenfield by Fox for the sale of the latter's stock. Passing by the question whether equity has jurisdiction of such simple contract obligations, as no such question is raised, we come to the merits of Greenfield's appeal from the decree entered.

From the proofs it appears that Fox was the owner of the majority of the stock of Fox Film Corporation and Fox Theatres Corporation, which stock Harley L. Clarke desired to buy. To that end Clarke enlisted the services of Blumenthal, who had at one time been a friend of Fox and who had accompanied him when the two men left California and came East. Clarke agreed to pay Blumenthal $500,000 commission if he could buy Fox' stock. As Fox, for some undisclosed reason, had parted company with Blumenthal and refused to have anything to do with him, Blumenthal, who was a resident of New York, sought to enlist the services of Greenfield, who was a friend of Fox, had had many business transactions with him, and who also was personally interested in having Fox pay an indebtedness of his of $10,000,000 to the Bankers' Securities Corporation. Accordingly, Blumenthal, who already had Clarke's promise to pay him $500,000 if he procured Fox' stock, entered into a verbal agreement with Greenfield to share with him such commission if Fox' stock could be bought for Clarke. The court found that there was no dispute as to the terms of the contract, which it found was as follows: "There is no dispute that prior to April 5, 1930, Blumenthal and Greenfield made an agreement to divide equally compensation which either of them might receive for services in connection with the sale which they had been trying to effect independently of one another. I find that it was the intention and understanding of the parties that this agreement related to compensation for services rendered directly in connection with the sale of Fox's controlling interest in the stock; in other words, such payments as could properly be described as commissions for making the sale."

Without entering into details, it suffices to say that the sale of Fox' stock to Clarke was effected and the commission to be paid by Clarke to Blumenthal was earned and paid to Blumenthal, who thereafter paid Greenfield one-half of the commission, namely, $250,000, which fell within the contract as found above by the court, viz.: "This agreement related to compensation for services rendered directly in connection with the sale of Fox's controlling interest in the stock."

But it further appeared that, while the controlling stock was sold by Fox and acquired by Clarke, and so far as Greenfield and Blumenthal were concerned the contract was fulfilled, two other things had arisen, which concerned Fox and Clarke alone, and in which neither Greenfield nor Blumenthal had any part or interest; namely, Fox insisted that he should be paid a salary of $500,000 a year for managing the company, and that, if Clarke and his associates undertook to underwrite and reissue stock, which they did not bind themselves to do, Fox was to have a share in such underwriting to the extent of 10, or it might be 20, per cent.

Now while the sale might not have been effected had not Clarke agreed to these two demands of Fox, yet the fact remains that, had the status of the three elements—the purchase of the stock, the agreement to employ, and the share in the proposed underwriting—remained unchanged, there could have been no further rights or transactions or obligations between Greenfield and Blumenthal. There was no concealment by Fox and Clarke of what they had done, nor of the supplemental agreements they had made as to Fox' employment and his participation in the proposed underwriting and flotation of stock in case it should be undertaken.

It is therefore apparent that, until some further agreement by Greenfield and Blumenthal was made, they were under no obligations to each other; the sale and purchase contemplated had been made; Fox had his contract of employment to do with as he saw fit, and his option to participate in the underwriting if it was undertaken and he chose to participate. And what Fox did with, or by virtue of, these two undertakings was a matter that alone concerned him and Clarke. At this point we note this was the view of the trial judge, who in his opinion [1] said: "Nothing had developed at that time to indicate that further service would be required of either party after the consummation of the sale, and it is unlikely that either anticipated there would be. If there had been such a possibility in mind, it is very probable that one or the

---

[1] Not for publication.

other of them would have said something about it."

The sale having been effected, subsequent conditions arose which made Clarke extremely apprehensive of danger from Fox and his percentage participation in the underwriting. Sales of large blocks of the underwritten stock were being made at advancing prices, which, under well-known methods of high finance, would enable the promoters to unload their stock on the public, but it was feared that Fox, who was to participate on a $30 per share basis, might unload his stock and break the market. Moreover, as subsequent events proved, Fox' attorney, Untermyer, was threatening a receivership and demanding a $1,000,000 fee in settlement, which fee he afterwards was paid by Clarke, and as a result the latter became very anxious to have Fox surrender his 10 per cent. participation in the underwriting. With that purpose in view, knowing from his experience in buying Fox' majority controlling stock that Blumenthal could effect nothing with Fox, and knowing that Greenfield had influence with Fox, Clarke sent for Greenfield and contracted to give Greenfield a commission of $250,000 if he could induce Fox to sell back or surrender his participation option. But in the meantime another change had taken place. Fox, too, had become very much concerned over the outcome of his participation option. He knew the price of the stock was being "rigged" or artificially boosted; he distrusted —and, as the event proved, rightly distrusted —the ability of Clarke and his associates to make a success of the movie business; he knew his counsel, Untermyer, was contemplating a receivership; he knew, if he participated in the underwriting, he would have to furnish funds to the extent of $30 per share; and during all this time, while the price of the stock was being boosted, Clarke had refused to give to Fox the stock which was due him under his option. When on a visit to the home of Greenfield in Atlantic City he stated to the latter that he was troubled about the outcome. Thereupon Greenfield expressed the belief that it would come out all right, and then offered to take 10 per cent. of the option off his (Fox') hands. This offer Fox then accepted. There is no contradiction of this testimony. If Fox was to accept the option, he had to accept it in toto, and Greenfield's assumption of one-tenth would have relieved Fox from raising one-tenth of his option at $30 per share. Greenfield testified that he had often thus taken shares of options, pools, and the like,

off Fox' hands, and there was no testimony to the contrary. Such being the situation of Fox and Greenfield, we note that Clarke's situation was not only one of anxiety but of grave peril. If Fox placed his $30 a share stock on the market, which was then by washed sales and "rigging" artificially boosted to $50 per share or thereabout, the market would be broken and the underwriting possibly ruined; while, if Fox' attorney, Untermyer, carried out his threat of a receivership, the whole structure might collapse. In this grave situation confronting Clarke, he sent for Greenfield with a view to employing him in securing a surrender of Fox' option. Greenfield came to New York, and, when told by Clarke of his wish in reference to Fox' option, he told Clarke that he (Greenfield) owned one-tenth of Fox' option, and he later showed Clarke an opinion from distinguished counsel that Fox' option, instead of being, as Clarke supposed, for 10 per cent., was, in counsel's opinion, for 20 per cent. So that Clarke was confronted by the fact that he had to reckon with three men, Fox, Untermyer, and Greenfield, and with a 20 per cent. option instead of a 10 per cent., as he had supposed. The result of the negotiations of Clarke and Greenfield was that the former employed the latter to procure a release of Fox' option, for which service he agreed to pay Greenfield $250,000. As an outcome of Greenfield's efforts, the option of Fox and Greenfield was surrendered for $3,000,000, and Untermyer was paid by Clarke his claimed fee of $1,000,000. Such being the status of Fox, Clarke, Untermyer, and Greenfield, and Clarke having paid Greenfield the $250,000 commission agreed upon for the release of the option, Blumenthal brought the present suit, in which he claimed to recover one-half of the $250,000 paid by Clarke to Greenfield. As to this claim, the trial judge held: "Clarke later on employed Greenfield to buy out or rather buy back this interest of Fox's. Greenfield induced Fox to sell it to Clarke for $3,000,000 and Clarke paid Greenfield $250,000 for these services. As I have stated, the money so earned was, in my opinion, entirely outside the scope of the commission sharing agreement with Blumenthal, and Greenfield was not under any obligation to divide it. It was paid for obtaining a re-sale of a portion of the interests originally sold. The question is purely one of fact, but somewhat similar situations existed in Painter v. Lamb, 65 Pa. Super. Ct. 13, and Lowe v. Hood, 276 Pa. 265, 120 A. 133, reference to which may be of some help." No appeal was

taken by Blumenthal from that part of the decree, and it therefore stands.

At the settlement of the release of Fox' option, Clarke paid him $3,000,000. Part of that payment was made by a note for $300,000. Fox immediately, then and there, handed that note to Greenfield in settlement of his 10 per cent. participation in his option. Blumenthal now contends that the $300,000 thus paid by Fox to Greenfield was for making the original sale of April 7, 1930; that it comes within the original agreement in which Greenfield promised to pay him one-half of what he received from Fox for making that sale; that Greenfield did not pay him the one-half he agreed to pay, but, on the contrary, concealed the fact that he had received it. He did not in his bill filed October 21, 1931, specifically declare upon this item, but there is evidence that he knew of the payment as early as September, 1930. Relief, however, was granted under his prayer for "other and further relief."

Greenfield, on the other hand, says that this $300,000 has nothing to do with the original contract, but relates to a separate and independent undertaking whereby he agreed with Fox to take 10 per cent. of his option with Clarke.

The learned trial court found that the $300,000 was paid for making the original sale, and that the payment was concealed by Greenfield. It found that "the friendly relations of the parties, the amount of time spent by Greenfield in Fox's behalf and without compensation from him, the vague sense of obligation which probably existed, all point to an intention to make some return for services rendered" in making the sale of Fox' stock.

Here the learned trial court left the evidence and entered the field of pure speculation, for there is not a word of competent testimony to sustain this finding. The only testimony of persons who know the facts is that of Greenfield and Fox, and they both explicitly and positively testified that the payment of this $300,000 had nothing whatever to do with the original sale, but was Greenfield's share in Fox' option.

The grounds on which the court based its finding not only do not point to that conclusion, but rather point to the contrary conclusion. The friendly relation of Greenfield and Fox was more evident in the statement of Fox to Greenfield of his anxiety over the option, when he thought he should secure his stock from Clarke while the market was being "rigged" and the price was high, and before the market broke, than it was in effecting a sale which Fox was unwilling to make. Greenfield calmed his friend's fear and offered to take 10 per cent. of the option. The amount of time spent by Greenfield in effecting the original sale was not primarily for Fox' benefit, and Fox did not so regard it. Fox did not want to sell, and was actually forced into doing so. He did not regard the insistence of Greenfield that he sell as based on friendship. It was rather based on Greenfield's business judgment, with which Fox was not in hearty agreement. While Greenfield would in no event take advantage of his friend, Fox, and without doubt honestly thought that the sale as urged by him was for the advantage of Fox, yet there were two other important considerations which the sale would bring about, the payment by Fox of $10,000,000 to the Bankers' Securities Corporation, and the fee of $250,000 to Greenfield. These, together with the belief that a sale was for the best interest of Fox, motivated Greenfield. Consequently no sense of obligation on the part of Fox arose out of this transaction, for there was no concealment of the fact that Greenfield was acting for Clarke in this matter, and Fox evidently knew that he was being paid by Clarke.

The question cannot but arise as to why this payment was not concealed, if it was made by Fox in the discharge of a sense of obligation to Greenfield for his services in bringing about the original sale of April 7, 1930. Fox and Greenfield were both acting honestly, or both were consciously acting dishonestly. If there was a scheme to beat Blumenthal out of a legitimate fee, Fox as well as Greenfield was in it. Assuming that there was, as the court found, how can it be explained that Fox, immediately, upon the receipt of the money, or notes representing the money, from Clarke or the General Theatres Equipment, Inc., in the presence of Clarke, Blumenthal's friend, and his attorney, Otto E. Koegel, Esq., immediately passed the note over to Greenfield for $300,000 in payment of his 10 per cent. participation in Fox' option, and was it a mere coincidence that the payment was for exactly 10 per cent. of the option? Fox, a man of large means, could easily have made the payment in cash at some other time so as to cover it up and protect his friend, Greenfield, if it had been their intention to conceal it. If Greenfield was deceiving Blumenthal, it could thus have been covered up, and Greenfield need never have testified to it. But he unhesitatingly testified to it when it became relevant for him to do so.

There never seems to have been any attempt to conceal this payment. Intelligent men would not have acted as these two men did, if they had intended to do anything wrong. Their entire conduct is inconsistent with such inference.

Again the question arises as to why the $300,000 was not paid when the sale was completed on April 7, 1930, and Fox received payment for his stock, if it was paid for services rendered in connection with that sale. Why did he wait until he was paid for his option? If Greenfield and Fox had a plan to cheat Blumenthal out of a fee, why did Fox not pay him secretly, for every probability was that the knowledge of this payment would come to Blumenthal through Clarke or his attorney, Koegel?

The answers to these questions do not justify the conclusion of the court. If we entirely disregard the testimony of Greenfield and Fox and draw inferences from undisputed facts which this court, as well as the District Court, may admittedly do (Budd v. Commissioner (C. C. A.) 43 F.(2d) 509; Kutz's Appeal, 100 Pa. 75; Hamilton v. Fay, 283 Pa. 175, 179, 128 A. 837; Pennsylvania Knitting Mills v. Bayard, 287 Pa. 216, 134 A. 397), then a reasonable and logical interpretation of these facts do not point to a reward for services for the sale of the stock, but, on the contrary, drive us to the conclusion that this payment was made for Greenfield's participation in Fox' option.

We are unable to accept the conclusion that this $300,000 was a gift. It may be that it was not a "legally enforceable obligation," upon which we do not now pass, but in the minds of Fox and Greenfield it was not a gift. It was just what they said it was, a 10 per cent. participation in Fox' option. Their agreement in regard to it they evidently felt bound to carry out, for, as soon as Clarke settled for the option, Fox immediately turned over to Greenfield his share.

But we are not left to inference for the decision in this case. It can be placed upon another and more solid ground. The bill did not waive an answer under oath. Consequently the defendant filed a responsive answer under oath. When an answer to a bill in equity is sworn to and is responsive to the allegations in the bill, the denials in the answer must be overcome by the satisfactory testimony of two witnesses, or by one witness corroborated by circumstances which are equivalent in weight to another. Demarest v. Winchester Repeating Arms Co. (D. C.) 257 F. 162, 170; Wilcox v. El Banco Popular de Economias, etc., 255 F. 442, 451 (C. C. A.); Vigel v. Hopp, 104 U. S. 441, 26 L. Ed. 765; Latta v. Kilbourn, 150 U. S. 524, 541, 14 S. Ct. 201, 37 L. Ed. 1169; Campbell v. Northwest Eckington Imp. Co., 229 U. S. 561, 572, 33 S. Ct. 796, 57 L. Ed. 1330. Here we do not have the competent testimony of a single witness to overcome the denial of the answer, for no one but Greenfield and Fox knows or can testify for what the $300,000 was paid and the circumstances corroborate them. Any other testimony is mere supposition. Consequently the denials of the answer have not been overcome.

While there was no specific allegation in the bill relating to this payment, yet the learned court found that the prayer for other and further relief was a sufficient ground for the relief granted. Accordingly, the answer must be construed as denying the complainant's right to the relief prayed for and given.

The above rule has been changed by statute in Pennsylvania, but in federal courts it is still the rule in equity cases. Coonrod v. Kelly, 119 F. 841 (C. C. A. 3); Rettig Beverage Co. v. United States, 13 F.(2d) 740 (C. C. A. 3); Braunstein v. United States, 24 F. (2d) 174 (C. C. A. 3).

The decree of the District Court is reversed, with directions to dismiss the bill.