## DEMAREST v. WINCHESTER REPEATING ARMS CO.

(District Court, D. Connecticut.   April 12, 1919.)

No. 1499.

1. EQUITY ⬅➡343—ANSWER UNDER OATH—PROBATIVE FORCE—WAIVER OF VERIFICATION.

Answer under oath has no less probative force because verification thereof was expressly waived by the bill.

2. EQUITY ⬅➡341—ANSWER UNDER OATH—PROBATIVE FORCE.

Verified answer, so far as responding to charges of the bill, has probative force, if verification be on personal knowledge, but otherwise if the answer professes not to be on personal knowledge.

3. FRAUD ⬅➡50—PRESUMPTION.

Fraud is not presumed, and cannot be imputed from circumstances consistent with honesty, but only from a showing of facts not fairly or reasonably reconcilable with fair dealing and honesty of purpose.

4. FRAUD ⬅➡58(1)—PRIMA FACIE SHOWING—REBUTTAL.

A prima facie case of fraudulent intent, made by showing of facts and circumstances, loses its force on a showing of other facts and circumstances sufficient to rebut and overcome it.

5. INJUNCTION ⬅➡155—PRELIMINARY INJUNCTION—REFUSAL ON GIVING OF BOND.

To safeguard the interests of plaintiff stockholder seeking, on the ground of fraud, to enjoin reorganization of defendant corporation, and at the same time to allow it to proceed with reorganization, the bill being met by verified answer and affidavits, and plaintiff's motive appearing to be to secure for himself the full value of his stock, one of his prayers being that the court ascertain its value and decree that it be paid to him before performance of the organization agreements be permitted, *held*, that preliminary injunction will be denied, and temporary restraining order dissolved, on condition of defendant filing a bond in the sum alleged by plaintiff to be the value of the stock, conditioned that it be agreed that the court grant such prayer and ascertain the value and order the amount paid to plaintiff.

In Equity.   Suit by Elmer W. Demarest against the Winchester Repeating Arms Company.   On motion for preliminary injunction. Denied on condition.

Elmer W. Demarest, of Jersey City, N. J., in pro. per.

Allan McCulloh, of New York City, and James E. Wheeler, of New Haven, Conn., for defendant.

THOMAS, District Judge.   Whether the plaintiff is entitled to an injunction pendente lite under the allegations of the bill, the answer thereto, and the accompanying affidavits of various witnesses, respecting those allegations, is the question presented and to be here decided.   A temporary restraining order was granted on February 18,

---

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1919, upon the filing of the bill, and the plaintiff is now seeking a preliminary injunction under the provisions of equity rule 73 (198 Fed. xxxix, 115 C. C. A. xxxix).

The bill, answer, and affidavits are all verified, although the verification of the answer was waived by the plaintiff. The allegations of the bill are set forth at great length, but the material allegations may be fairly summarized as follows:

(1) The incorporation, powers, and capital stock of the defendant company and the citizenship of the parties are set forth. It is alleged that the plaintiff is the owner of 38 shares of the capital stock of the defendant company, which formerly, from the death of William M. Bishop, about the year 1902, were registered on the books of the defendant company in the name of his widow, Rose E. Bishop, as executrix of his estate, and that 5 of said shares have been owned by the plaintiff since 1916, and the remaining 33 shares were transferred into his name in the month of October or November, 1915, since which time the plaintiff has been trustee of 11 of such shares for Rose E. Bishop, individually, of 11 of such shares for Rose E. Bishop, trustee for William E. Bishop, and of the remaining 11 of such shares for Rose E. Bishop, trustee for Harold B. Bishop. It is further alleged that since its incorporation the defendant has erected a large plant, consisting of buildings, machinery, and equipment, in New Haven, where it has for many years past conducted a large and remunerative business; that prior to the year 1915 the annual statement of its financial condition showed that in addition to its capital it had an equity in its plant and other assets and surplus amounting to more than $15,000,000; that between the years 1900 and 1915 it paid large dividends, varying in amount and averaging about 50 per cent. a year; and that the stock of the company was during said period considered a high-grade investment security and frequently sold as high as $1,400 a share, and during the year 1915 it sold in the open market at $3,200 a share, which sum was offered to the plaintiff for said 38 shares of stock, but said offer could not be accepted, and sale and delivery made to the bidder, because of the refusal of the defendant company to transfer said stock.

(2) It is alleged that late in 1914 or early in 1915 the defendant company entered into contracts with the Russian and English governments for the manufacture of munitions for the European war, and in order to furnish materials contracted to be sold thereafter and until the termination of said war, ran at full capacity, built new buildings, and installed new machinery for the purpose of performing said contracts. It is further alleged that the financial statement presented at the annual stockholders' meeting in February, 1915, showed that, in addition to its capital of $1,000,000, the defendant had a surplus account amounting to $15,842,312.

(3) It is alleged that the financial statement presented at the annual stockholders' meeting in February, 1916, showed gross assets of $40,016,574 and that after charging off $3,154,137 for depreciation of plant, there remained a surplus of $18,332,925 over and above the capital stock of $1,000,000, showing an increase of $2,500,000 for the

said year. It is also alleged that the president, in the report given by him, stated that the special war business, exclusive of regular business for 1916, already contracted for, amounted to $48,176,743, that the earnings for 1915 amounted to $4,600,000, and that it was estimated that the profits for 1916 upon special war orders would amount to $7,000,000.

(4) It also alleged that the printed financial statement mailed to creditors in February, 1917, showed gross assets of $42,458,262.50 and a surplus of $18,343,487 over and above the capital stock of $1,000,000, and that notwithstanding the fact that additions had been made to the plant during 1916 it was carried in said statement at $2,000,000 less than in the statement of the previous year. It is further alleged that the financial statement for 1916 was certified by Arthur Young & Co., certified public accountants, and that attached thereto was a report of the directors, stating that during 1916 the defendant had borrowed $16,000,000 secured by its 5 per cent. notes for that sum, payable in March, 1918, and that with the proceeds of such loan there had been paid indebtednesses of the defendant amounting to $8,250,000, and that among the directors signing said report appeared the name of J. E. Otterson, who is alleged to be the president of the company, and also the name of C. S. Sargent, Jr.

(5) It is further alleged that the printed financial statement mailed to stockholders in February, 1918, showed that the gross assets of the defendant were $37,806,341, including a net balance on valuation of buildings of $14,493,796, after deducting depreciation charges; that the net value of the plant, machinery, and tools had been decreased by $3,200,000 from 1916, and the inventory decreased by $8,500,000 during 1917; that the surplus of $18,343,487 in the profits had been adjusted to $17,990,000, and that after said adjustment a surplus of $18,586,218 over and above the capital stock of $1,000,000 was shown, being an increase over the previous year. It is also alleged that the gross profits for 1917 had been $4,617,847 and the net profits $2,979,048, after charging off $1,564,789 for depreciation and reserve in excess of said adjustment. It is also alleged that this financial statement contained a special report, signed by nine directors, including J. E. Otterson, who is again described as president, and C. S. Sargent, Jr., director of both the defendant company and Kidder, Peabody & Co., which stated that the defendant was in a financial condition to pay at maturity in March, 1918, one-half of the $16,000,000 in notes issued in 1916, and that new notes for the remaining $8,000,000 would be issued on March 1, 1918, payable March 1, 1919, and called attention to the fact that the inventory had been reduced by $8,500,000; cash, accounts receivable, and securities increased by $7,562,000, in addition to retiring advances on contracts of $5,782,000; that the defendant's commercial business was in a very satisfactory state; that in addition to the regular commercial business the defendant held contracts for the United States government to the value of over $50,000,000 on a cost and percentage basis, which were proceeding satisfactorily; and that from its present outlook the gross business for the fiscal year should be between $40,000,000 and $50,000,000.

(6) It is alleged that since 1915 the defendant company has paid no dividends; that the statements above referred to showed that after liberal depreciation and amortization charges the plant was carried at nearly $5,000,000 less on January 1, 1918, than in the statement of two years prior thereto; that the inventory within said two years had been decreased nearly $2,000,000; that after adjustment charges the surplus of the defendant was nearly $3,000,000 more than that appearing in the statement of January 1, 1918; that the plaintiff had been unable, as shown by correspondence referred to in the complaint, to ascertain the total cost of the enlargement of the plant and machinery and the amount charged off to depreciation and amortization since the beginning of the European war; that statements from the officers of the defendant company referred to in the complaint at all times until recently had represented that the defendant was doing a satisfactory business at a fair profit, was liberally charging off for depreciation and amortization, was able to pay when they became due $8,000,000 of its notes out of its profits, and would, except for the uncertainty of the federal tax, be in a position to retire the remaining $8,000,000 in notes in March, 1919; and that the defendant's financial condition appeared better and no worse than at the outbreak of the European war.

(7) It is further alleged that the plaintiff received on or about October 20, 1918, a letter dated October 7, 1918, signed by T. G. Bennett, president of the defendant company, in which letter the plaintiff was requested, "if this [the plan] meets with your approval," to deposit his stock with the Union & New Haven Trust Company as a depository for the purpose of carrying out a certain reorganization. Inclosed in this letter was a printed circular letter, dated September 25, 1918, announcing with all gloom and pessimism the necessity for a reorganization, which circular letter is marked Exhibit B. Therein the plan is outlined, and it is stated: That it was necessary for the company to raise additional funds in order to embark into a new line of business. That a portion of the $8,000,000 of notes maturing March 1, 1919, would be paid out of the earnings and surplus. That a syndicate had been formed to finance the company. That J. E. Otterson, then vice president, but now president, of the company, would continue in the management of the company. That Louis K. Liggett, president of the United Drug Company, would associate himself with the undertaking. That on August 7, 1918, the committee of the directors had been appointed to consider a reorganization, and recommended that a new company be formed to take over the property and business of the defendant company and issue stock as follows:

"The original issue of capital stock of the new company to be $10,000,000 of 7 per cent. cumulative first preferred stock, $2,000,000 of 6 per cent. non-cumulative second preferred stock, and $1,000,000 of common stock, all of said stock to be issued as fully paid for the assets of the present company, subject to its liabilities, and the sum of $3,500,000 in cash, which is to be contributed as new capital."

That the common stockholders should have the voting power, unless the dividends upon the first preferred stock were in arrears to the

extent of more than 7 per cent., in which case the first preferred stockholders should have full voting powers, subject to the redemption of their stock. That $7,500,000 of the first preferred be given to the stockholders of the defendant company in exchange for their stock, and that each shareholder of the defendant company should receive 7½ shares of the first preferred stock of the new company in exchange for each share held by him in the defendant company, and that the—

"balance of the original issue of the new company, viz. $2,500,000 of first preferred stock, $2,000,000 of noncumulative 6 per cent. second preferred stock, and $1,000,000 of common stock, will be delivered to Kidder, Peabody & Co. and their associates upon completion of the arrangements for the contribution of $3,500,000 of new capital stock in cash."

Plaintiff also alleges that he was informed by an officer of the defendant company that the new business contemplated by the officers and influences dominating them were somewhat speculative and that Kidder, Peabody & Co., or their associates, were to receive the sum of $2,000,000 for services in financing said scheme. The plaintiff charges that, by the letter—Exhibit C—and said proposed agreement, it is the intention to pay Kidder, Peabody & Co. and their associates the sum of $2,000,000 for their services, and that Kidder, Peabody & Co., or their associates, were, in return for $3,500,000, to receive $2,500,000 of the first preferred, $2,000,000 of the second preferred, and all of the common stock of the proposed company with the exclusive voting power, management, and control thereof, and that this was equivalent to giving to them the entire issue of the common stock and $1,000,000 of the second preferred stock in payment of their services; and that the stockholders of the defendant company would receive $7,500,000 for the entire assets of the defendant company, amounting to upwards of $20,000,000, their stock, and the management of the company.

(8) The plaintiff alleges: That he wrote a letter, dated October 21, 1918, to Mr. Bennett, the president of the defendant company, a copy of which he annexed to the complaint, marked Exhibit D, making certain inquiries, which inquiries he charges have not been answered. That he received in reply thereto from the president a letter, dated November 2, 1918, a copy of which is annexed to the complaint, marked Exhibit E, together with an accompanying "Memorandum in Regard to Reorganization of Winchester Repeating Arms Company," a copy of which is annexed to the complaint and marked Exhibit F, which recited the plan of reorganization and explained that the plant had been enlarged to the extent of $7,167,000, that the sum of $7,733,000 had been expended for tools and machinery, that the company had borrowed and repaid $2,000,000, in addition to the $8,000,000 on notes retired, and that but for the federal tax the company would probably be able to retire in March, 1919, the remaining $8,000,000 in notes. There also accompanied this letter a photographic financial statement as of June 30, 1918, which is marked Exhibit G. This statement shows that the capital stock is $1,000,000, and the surplus

$20,765,958.52, which figures, it is alleged, give a valuation to each share of stock now held by plaintiff of $2,176.59.

It is further alleged that on November 8, 1918, plaintiff wrote a letter to Thomas G. Bennett, a copy of which is annexed to the complaint and marked Exhibit H, and on November 26th received a reply which is marked Exhibit I, in which Mr. Bennett suggested that plaintiff call on Mr. Sargent, who was a member of Kidder, Peabody & Co., and a director in the defendant company.

It is also alleged that the plaintiff, in the early part of December, received a copy of the circular letter dated December 3d, from the committee to the stockholders, which is annexed to the bill and marked Exhibit J, inclosing a copy of the circular letter from Kidder, Peabody & Co. to the stockholders, dated the same day, which is also annexed to the bill and marked Exhibit K, which letter offered an amendment to the previous stockholders' deposit agreement and contained the following alternative propositions:

(a) That for each 7½ shares of first preferred stock of the new company he might obtain one share of common stock of the new company in exchange for 1½ shares of the defendant company, or that

(b) For each share of stock of the old company, the stockholder might subscribe $350 to the syndicate, and be entitled to share proportionately in the securities of the new company in the manner following: Two and one-half shares first preferred stock, two shares of second preferred stock, and one share of common stock for each $350 subscribed. These options were referred to as A and B.

(9) This paragraph of the bill alleges at great length the plaintiff's version of the interview held on December 19, 1918, with J. E. Otterson, president, and C. S. Sargent, Jr., both directors in the defendant company, Mr. Sargent being also a director in Kidder, Peabody & Co., in which the plaintiff offered to sell his stock for $2,300 per share which "would apparently be the book value of the said stock as nearly as the complainant could ascertain the earnings for the last six months of the year 1918. To this offer the said Otterson and Sargent offered to pay no more than $750.

(10) The plaintiff refers to a letter written by him on January 29, 1919, to Mr. Otterson, a copy of which is annexed to the complaint and marked Exhibit L, and to the reply of counsel thereto dated February 5, 1919, a copy of which is annexed to the complaint and marked Exhibit M. The plaintiff also sets forth his version of his subsequent telephone conversation with Mr. Sargent. It is also alleged that—

"It is obvious from the statement of the said Sargent and the statement contained in Exhibit M that it is the intention of the directors of the defendant company, the said Kidder, Peabody & Co., their associates, and the said so-called syndicate, to form a new company to oppress, cheat, and defraud the stockholders of the defendant company by minimizing the value of the stock, to manage the defendant corporation according to the desires of the new company solely for the benefit or enhancement of the value of the shares of the common stock of the old company held by the new company, or for such other purpose of the new company as the board of directors

thereof may consider desirable,' and to 'impose upon the shareholders of the defendant company, the debts and obligations of said business, including that of the contemplated company and divert the profits to be obtained therefrom to the stockholders of the new company to the exclusion of the stockholders of the defendant company.'"

(11) It is alleged that the annual meeting of the stockholders was appointed to be held at the office of the defendant company in New Haven on February 19, 1919, and the plaintiff charges that it was the intention of defendant, Kidder, Peabody & Co., and Messrs. Otterson and Sargent to take and procure such action at the meeting as would effectuate the proposed plan of reorganization for stock control, to create additional obligations of the defendant payable in preference to the value of the present capital and surplus to stockholders, to permit Kidder, Peabody & Co. to collect either directly or indirectly from the defendant or its assets said unconscionable sum of money, and to elect a servient board of directors to carry out said inequitable program and diminish or destroy the value of the holdings of the stockholders who have not acquiesced in said reorganization plan.

(12) In this plan, set forth at great length, are the allegations respecting the fraud proposed to be perpetrated by Otterson, Sargent, and others against the plaintiff, the details of which are here omitted, but the direct charge of fraud is set forth in part as follows:

"Complainant charges that the action already taken and that contemplated by the officers of the defendant company, Kidder, Peabody & Co., and their associates are *unjust, inequitable, and an obvious and transparent attempt to defraud* the stockholders of the defendant company, who have not assented to said reorganization plan, that, if successful, would give the said syndicate stock of the old company worth $2,176 per share on June 30, 1918, exclusive of profits made since that date and after liberal depreciation and amortization charges, for a venturesome stock worth no more than $750, without future prospects of profit, and without the right of management."

Respecting the three plans submitted, it is alleged with reference to the third plan that it "is a bold plan of an outsider, who is a creditor of the defendant company, to an extent where his security is not jeopardized *to steal from and defraud* the stockholders of the defendant company * * * upon oppressive and inequitable terms," and then follow many allegations from which the conclusion is drawn that the whole proposition generally is a scheme to defraud the 3 per cent. of the stockholders who have not entered the stock deposit agreement, and asserting that the $2,000,000 to be paid Kidder, Peabody & Co. and their associates, whether in stock or in cash, is an unconscionable sum, usurious, and unjust, and a fraud upon the stockholders of the defendant company, who refuse to enter this agreement.

The prayer for relief briefly is as follows:

(1) That a subpoena issue and that the defendant answer the allegations of the bill, "an answer under oath being hereby expressly waived."

(2) That the defendant account for all money, assets, and property owned by it at the present time, and render an account of the true

value of defendant's plant as of July 1, 1914, with debts then owing and an account of profits and losses since July 1, 1914, to the present time.

(3) That defendant render an account of all money expended by it since July 1, 1914, for the enlargement of the plant by the erection of buildings, purchase of lands, acquisition of new machinery, tools, and equipment, and the sums charged off for depreciation.

(4) That the defendant exhibit to plaintiff the minutes and records of the board of directors to show what acts have been done with respect to the adoption or acceptance of the plans of reorganization.

(5) That the court decree that the proposed plans of reorganization referred to in the bill and the exhibits and as contained in the agreement of September 24, 1918, and amended by the letters of November 26, 1918, and January 25, 1919, are fraudulent, usurious, inequitable, and unconscionable contracts and an illegal disposition of the assets of the defendant corporation and the rights of such stockholders as have not assented to the agreement, and—

"that the court ascertain the value of your orator's stock, and decree that the said value shall be paid to him before the defendant enter into said agreements or permit the same to be performed."

(6) That the court decree the actions of Otterson, President of the defendant company, and C. S. Sargent, Jr., a director thereof, are fraudulent and inimical to the interests of the stockholders, and that all acts by them be declared null and void.

(7) That the court appoint an interlocutory receiver of the assets of the defendant company.

(8) That the defendant, its officers, and agents be, during the pendency of this suit and thereafter, perpetually enjoined and restrained from any and all acts of every kind and nature touching the general proposition here assailed.

The answer of the defendant may be summarized briefly as follows:

All formal allegations respecting incorporation, residence of the parties, and that the 38 shares of stock of the plaintiff were transferred on the books of the company on October 28, 1915, are admitted.

All allegations respecting the sending and receipt of the letters by the defendant to the plaintiff and from the plaintiff to defendant, as set forth in the different paragraphs of the bill and therein referred to as Exhibits A, B, C, D, E, F, G, H, I, J, K, L, M, and N, are admitted.

Many allegations made by the plaintiff respecting the figures involved in the transactions discussed in the bill this defendant alleges are erroneous, and points out the corrections, claiming that the sum total of those errors and discrepancies is approximately $11,000,000.

All allegations made by plaintiff respecting the inferences or conclusions drawn from the financial statements, letters, stockholders' agreements, and all allegations respecting the effect of the proposed plans, each and all of them, which are detailed at great length in the bill, the defendant denies.

All allegations charging deceit, fraud, theft, illegality, usury, conspiracy to cheat and defraud, oppression, and inequity are denied.

Without attempting to detail all the positive and negative allegations contained in the answer, I think the matters above referred to fairly present the tenor of the answer, and thus disclose the issue between the parties.

Thus at considerable length I have outlined the main features of this case, in order that the material claims of the parties may be fully presented, without in the least denying to either party full consideration of everything that has been alleged pro and con in this controversy.

From the bill and answer the whole issue may be condensed into a single thought, which is succinctly expressed in a single question, to wit:

Does this defendant corporation, its directors, and officers propose a plan of reorganization which is conceived in fraud and chicanery, with the manifest intent of cheating and defrauding this plaintiff out of his legal rights as a stockholder, and destroying the value of his property rights?

If the proof presented justifies an affirmative answer to the question propounded, then the prayer for an injunction should issue; otherwise, it should be denied.

[1, 2] But at the very threshold of this long discussion certain legal principles are invoked in behalf of this defendant, which, if sound, may preclude a discussion of the merits of the controversy.

The defendant's answer, denying all the material allegations of the bill, is verified, and because of this the defendant relies upon the rule laid down by Judge Morrow, of the Circuit Court of Appeals for the Ninth Circuit, sitting as a District Judge, in Water Co. of Tonopah v. Public Service Commission of Nevada et al. (D. C.) 250 Fed. 304. The court said:

"The well-established rule is that on such an application for a temporary injunction, if an answer under oath has been filed denying the equities of the bill, the temporary injunction will not issue, for the reason that the sworn answer is evidence on behalf of the defendant, and rebuts the allegations of the bill, and such allegations are therefore left at least doubtful."

But the plaintiff contends that this rule cannot apply because its strict application would strip the court of jurisdiction and that filing an answer formally verified to accomplish such a purpose is preposterous and further insists that an examination of the case of Water Co. v. Public Service Commission of Nevada, supra, will show that it does not support the argument.

Before deciding this question, we must for a moment recall that the verification to the answer was waived, but in spite of that the defendant chose to file a verified answer. In addition, it appears that the proof offered in support of the bill is the affidavit of the plaintiff alone, supported by one other witness, and he only as to a certain conversation. Not only is the defendant's answer verified, but the defendant has put in evidence, to overcome the proof contained in the plaintiff's supporting affidavits, the testimony of some

ten witnesses, whose testimony is offered to deny the allegations contained in the bill and the plaintiff's affidavit.

Upon this point the plaintiff contends that, where a bill calls for an answer under oath, the latter is evidential, and can be rebutted by the evidence of two or more witnesses, or that of a single witness and a preponderance of proof, and that this rule is not in harmony with the rule in the Water Co. Case, supra; but where the oath is expressly waived, as here, a verified answer has no probative force.

In Clements v. Moore, 73 U. S. (6 Wall.) 299, 18 L. Ed. 786, the Supreme Court held that a complainant in chancery cannot, by waiving a verification on oath of the defendant's answer, deprive such answer, when made with such verification of its ordinary effect. On page 314 of 73 U. S. Mr. Justice Swayne, speaking for the court, said:

> "The complainants waived an answer under oath by this defendant. Her answer is nevertheless verified by an affidavit. This was proper. It was her right so to answer, and the complainants could not deprive her of it. Such is the settled rule of equity practice, where there is no regulation to the contrary."

In Woodruff v. Dubuque & S. C. R. Co. (C. C.) 30 Fed. 91, it was held that the waiver by a complainant in equity of an answer under oath does not take away the right to answer under oath, and such answer, so far as responsive to the bill, must, upon motion for a preliminary injunction made upon bill and answer, be taken as true, and on page 93 Judge Wheeler said:

> "The bill charges that it is so done. The answer denies this, and in this respect it is directly responsive to the bill. By the law an answer so responsive is evidence, which must be overcome by other evidence or stand. It is said that the orator waived an answer under oath, as the rules in equity provide may be done. This is not understood to take away the right to answer under oath, and, when a defendant does so answer, the effect of the answer as evidence would appear to rest upon the law of the subject, which the rules of court do not appear to attempt to change. The answer must therefore, in this respect, for the purposes of this motion, be taken to be true."

So the question naturally follows as to whether the answer under oath has probative force. It is well-settled practice in equity that, if the verified answer professes not to be on personal knowledge, it has no probative force, and merely puts the matter in issue. But if the verification be on personal knowledge, and is responsive to the charges contained in the bill, as here, then the rule is that the answer is evidential, has probative force, and is more than a simple pleading putting the facts well pleaded in issue. Nor do I find anything in the new rules indicating anything which changes the pre-existing law as to the probative force of a sworn answer in an equity suit.

In Latta v. Kilbourn, 150 U. S. 524, on page 541, 14 Sup. Ct. 201, on page 208 (37 L. Ed. 1169), Mr. Justice Jackson said:

> "Under the well-settled rules of equity pleading and practice, his answer [which was under oath] must be overcome by the testimony of at least two witnesses, or of one witness with corroborating circumstances."

Vigel v. Hopp, 104 U. S. 441, 26 L. Ed. 765, was a suit in equity to set aside a deed. There were numerous allegations of fraud in the bill. The answer denied all the allegations of fraud, and the court held that, where the answer is responsive to the allegations of the complainant's bill, they must, to entitle him to relief, be sustained by the testimony of two witnesses, or of one witness corroborated by circumstances which are equivalent in weight to the testimony of another witness. See, also, 2 Story, Equity, § 1528. This ruling was followed in Union Railroad Co. v. Dull, 124 U. S. 173, 8 Sup. Ct. 433, 31 L. Ed. 417, and in Southern Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, and in Kennedy et al. v. Custer et al., 174 Fed. 972, 98 C. C. A. 584.

"And it is a well-settled rule that, when the sworn answer fully and unequivocally denies all the material allegations of the bill upon which complainant's equities rest, the injunction will be dissolved." High on Injunctions, § 1505.

In addition to the sworn denials in the answer to all the allegations of fraud, to say nothing of many of the less important allegations, there are in this record the affidavits of all the members of the stockholders' committee, the affidavits of the officers and directors cumulatively denying many of the allegations based upon the financial transactions of the company, all of the allegations respecting the inferences drawn by the plaintiff respecting the purport and intent conveyed in the stockholders' agreement and decisively denying all of the direct allegations of deceit, fraud, usury, theft, oppression, and conspiracy, as well as denying all allegations from which inferences and conclusions may be drawn respecting the fraud and chicanery charged in the bill.

So that we have in the instant case a situation, so far as proof is concerned, similar to that presented in Water Co. of Tonopah v. Public Service Commission of Nevada, supra, as will appear if we read in full what Judge Morrow said. I quote fully. He said:

"I do not think the *evidence is sufficient* to justify the court in granting the temporary injunction. *It is by no means clear* that the water rates prescribed by the commission in this case will be confiscatory. On the contrary, *the charge made in the bill that such would be the case seems to me to be fully rebutted by the answer and its supporting affidavits.* The well-established rule is that *on such an application for a temporary injunction,* if an answer under oath has been filed denying the equities of the bill, the temporary injunction will not issue, for the reason that the sworn answer is evidence on behalf of the defendant, and rebuts the allegations of the bill, and such allegations are therefore left at least doubtful. That is the situation here. The evidence on behalf of the complainant is not sufficient to overcome the evidence that has been submitted on behalf of the defendants."

The very words of that opinion may be read upon the bill, answer, and affidavits offered by the plaintiff and by the defendant in this case. See, also, Home Insurance Co. v. Nobles (D. C.) 63 Fed. 642; City of Sacramento v. Southern Pacific Co. (C. C.) 155 Fed. 1022; St. Louis, K. C. & C. Ry. Co. v. Dewees et al. (C. C.) 23 Fed. 691; Woodside v. Tonopah & Goldfield R. Co. (C. C.) 184 Fed. 358; Star Co. v. Colven Pub. House (C. C.) 141 Fed. 129; Stevens v. Missouri, K. & T. Ry. Co., 106 Fed. 771, 45 C. C. A. 611; Blakey et al. v. National Mfg. Co. et al., 95 Fed. 136, 37 C. C. A. 27.

Hence I must conclude upon such abundant authority that the defendant's contentions in this aspect of the case are sound.

[3, 4] But as the rights of the plaintiff are very substantial, and lest an injury may result by this ruling, I have concluded, briefly as possible, to discuss and decide the questions here raised on the merits of the controversy, and for this purpose I shall confine the discussion to the sweeping charges of fraud alleged against the defendant, its officers, and directors, and in order to reach a conclusion upon the fraud alleged, and whether the proof justifies the intervention of the extraordinary equitable remedy of injunction, it is sufficient to apply a few of the fundamental principles of law respecting fraud.

In the case at bar fraud is the gist of the whole action. Aside from the other proposition of law, just decided, the plaintiff clearly relies upon his charges of fraud to justify his application for, and the granting by the court of, a temporary injunction.

The universal rule is that fraud is never presumed. The legal presumptions are in favor of honesty and fair dealing. There can be no imputation of fraud when the circumstances and facts upon which it is based are consistent with honesty and purity of intention, and while, as above stated, the general rule obtains that fraud is not presumed as a matter of law, yet it may be inferred from proof of certain facts. No arbitrary or inflexible rule can be given as to the quantum or degree of evidence required to raise a presumption of actual fraud. The rule has been thus stated:

"The proof, however, must be satisfactory. It must be so strong and cogent as to satisfy a man of sound judgment of the truth of the allegation. It need not possess such a degree of force as to be irresistible, but there must be evidence of tangible facts from which a legitimate inference of a fraudulent intent may be drawn. And an allegation of fraud is against the presumption of honesty: it requires stronger proof than if no such presumption existed. As it is against a presumption of fact, perhaps even a slight one, it requires somewhat more evidence than would suffice to prove the acknowledgment of an obligation or the delivery of a chattel. It is not necessary, however, that the fraud should be proved beyond a reasonable doubt. Issues of fact in civil cases are determined by a preponderance of the evidence, and the rule applies as well to cases in which fraud is imputed as to any other."

A fair rule is that when the plaintiff makes proof of facts and circumstances which not only cast a suspicion on the transaction, but show a state of facts which cannot be fairly or reasonably reconciled with fair dealing and honesty of purpose, he has then overcome the presumption of purity of intention, and has made a prima facie case. As fraud may be inferred from facts and circumstances proved, it is the rule that, when such facts and circumstances are sufficient to make a prima facie case of fraudulent intent, they may be taken as conclusive evidence of such intent, unless met by proof of other facts and circumstances sufficient to rebut and overcome the prima facie case already made.

Even if we concede, arguendo, that the plaintiff's proof casts a suspicion on the transaction, that he has established a prima facie case, and that his construction of the intent and purposes of the officers and directors of the defendant company is fraudulent, nevertheless the de-

fendant has clearly met the obligation imposed upon it by the rule, for it has met the plaintiff's proof by other facts and circumstances sufficient to rebut and overcome the plaintiff's prima facie case.

The plaintiff develops a situation and marshals facts and circumstances in the bill and by his own affidavit, as well as in an able argument, which he insists proves fraud—from which fraud must be inferred. Without detailing them, for they are many and set forth at great length, he says that no other inference could be drawn, but an inference that the contemplated action of the officers and directors was conceived in an attempt to destroy the property rights of the plaintiff, and to be executed in furtherance of the willful and malicious design already formed.

But the affidavits of the defendant emphatically deny such inferences and such intentions. The facts pleaded, the defendant says, do not justify any other conclusion than a fair and honest effort to meet, in a fair and honest way, the present financial situation, in which the defendant finds itself as the result of the signing of the armistice, and that the financial reorganization can in no way injure the property rights of the plaintiff, because the new corporation proposed to be organized is a holding company, which shall take and hold the stock of those who enter the stockholders' agreement and which now amounts to 97 per cent. The defendant further says that such holding corporation, so far as the operations of the defendant company are concerned, will be dependent for its income from its stock holdings upon the prosperity of the defendant corporation, and such prosperity will be enjoyed by the 3 per cent. of stockholders who do not enter the agreement as well as by the stockholders of the proposed new corporation, which will hold the 97 per cent. of the stock of those who enter the agreement. Under such a plan the defendant company does not part with its assets, so that the 3 per cent. of stockholders remain the owners of the assets of the defendant company in proportion to their stock holdings. This conclusion is sound.

The plaintiff contends that, as certain persons are both directors in the defendant company as well as interested in or members of the bankers' firm which is to furnish the cash capital required for the assistance of the defendant, the only inference to be drawn is that they are personally bound to gain in a financial way at the expense of the plaintiff and others, as is conclusively shown by the fact that Kidder, Peabody & Co. are to receive $2,000,000 in stock as its compensation for supplying $3,500,000 in cash to meet pressing obligations, and that Mr. Sargent, at least, is a member of that company, as well as a director of the defendant company.

But the defendant's answer to that is that Mr. Sargent withdrew from the meeting of directors when the vote was taken and took no part in the discussion concerning it. The entry of Kidder, Peabody & Co. into the finances of the defendant occurred over two years ago, when the company was in financial straits as the result of losses in war orders with the British government, and for the vast sums of money loaned the company it was natural that Kidder, Peabody & Co. should have a representative on the board of directors.

While Mr. Sargent's presence there is no fraud, and no evidence of fraud, in the present situation, it unfortunately gives rise to such a claim when it appears that his firm is to receive $2,000,000 in stock for its fee, which amount this court cannot, upon this hearing and at this time, without further evidence, hold to be an unconscionable sum, for the value of the stock at a future time must be first determined, and the services to be rendered are at present, so far as either quantum or value is concerned, indefinite. I think it may fairly be said even now to be a very large fee, but whether it is unconscionable, which it must be to justify an injunction to prevent the reorganization plan from being carried out, I cannot upon the proofs at this time so hold. At final hearing on the merits this question may then be decided.

Without attempting to answer all the claims advanced by both sides to this controversy, upon the whole case the attitude of the court may be stated in a single sentence. I think the record presents too many elements of doubt to warrant the issuing of a preliminary injunction.

[5] But it may be that there are some equities which the plaintiff may be able to establish at final hearing, and my concern is to protect those equities, and at the same time allow this defendant to be relieved of the temporary stay already granted, that it may proceed with its reorganization plan.

A serious question arises concerning the plaintiff's remedy at law. I am not clear but that he could recover at law. But without deciding that question, and for the purpose of ascertaining how he may be protected, let us revert to the last part of the fifth paragraph of the prayer for relief, wherein the plaintiff prays:

"That the court ascertain the value of your orator's stock, and decree that the said value shall be paid to him before the defendant enter into said agreements or permit the same to be performed."

This prayer for relief, doubtless, is predicated upon part of the allegations in the bill found in paragraphs 9 and 12, which, so far as are here pertinent, allege in substance that on December 19, 1918, plaintiff had a conference with J. E. Otterson, president, and C. S. Sargent, Jr., a director, of the defendant company, and at said conference said Otterson and Sargent importuned plaintiff to deposit his stock under the proposed plan of reorganization, or to accept $750 per share for his stock, both of which propositions the plaintiff declined, but did offer to sell his stock for $2,300 per share, which he then claimed to be the apparent book value, which price Otterson and Sargent declined to pay, and offered no more than $750. It is also alleged that the stock held by plaintiff was on June 30, 1918, worth $2,176, exclusive of profits made since that date, and that $2,176 represents the real value of the stock, which amount the plaintiff has indicated a willingness to accept.

Without imputing to the plaintiff any motive except the laudable one of endeavoring to secure for himself the full value of his stock in this company, it is apparent, from some of the allegations in the bill and the prayer for relief, that such a disposition of the matter is the goal toward which he is striving—at least one of the goals. With that purpose in view, I think the interests of the plaintiff are prop-

erly and well safeguarded, though perhaps the equities may not be preserved, if I conclude that the motion for the preliminary injunction be denied, and the temporary restraining order heretofore granted on the filing of the bill be dissolved, upon condition that the defendant file a bond in the sum of $83,000, which amount represents in round figures the value of plaintiff's 38 shares of stock at $2,176, conditioned that the plaintiff agree that the court grant that part of the prayer for relief respecting the value of the plaintiff's stock, and upon proper proceedings ascertain the value of the plaintiff's stock, and order the defendant to pay to the plaintiff such amount as shall ultimately be adjudged its fair value, and, for the purpose of carrying out the intent of this suggestion, the order of the court denying the plaintiff's motion, filed March 13, 1919, for an inspection of the books of the defendant company, is revoked, and the motion granted.

When the defendant company files with the clerk of this court written assent of its willingness to file a bond, or give proper security in the sum of $83,000, the motion for preliminary injunction will be denied, and the temporary restraining order heretofore granted on the filing of the bill will be dissolved; and it is

So ordered.