TEXAS CO. et al. v. ROSENTHAL–BROWN FUR CO., Inc., et al.

(District Court, W. D. Louisiana, Lake Charles Division. December 11, 1925.)

No. 216.

1. **Landlord and tenant** ⬥◯⬦95—**Under lease granting exclusive trapping rights for 10 years, and reserving to lessor right to sell, subsequent sale of land did not cancel lease nor authorize purchaser to cancel it (Rev. Civ. Code La. arts. 2733, 2474).**

Where lease granting exclusive trapping rights for ten years reserved to lessor right to sell land, and provided that, if trapping operations interfered with lessor, he might, at his option, cancel lease, agreement to be binding on parties' successors and assigns, *held* that under Rev. Civ. Code La. arts. 2733, 2474, sale of property did not cancel lease, nor authorize purchaser to cancel it, at his option.

2. **Reformation of instruments** ⬥◯⬦45(9)—**Antecedent agreement between parties to trapping lease that sale of property would cancel lease, and erroneous omission thereof from formal lease, held not proved.**

Evidence *held* insufficient to show antecedent agreement between parties to trapping lease that sale of property by lessor would cancel lease, or error in omitting such provision from formal written lease, so as to authorize reformation.

3. **Evidence** ⬥◯⬦182—**Undated carbon copy of letter found in decedent's files held inadmissible against party to whose attorneys it was addressed, who denied having received it.**

Undated carbon copy of letter found in decedent's files was inadmissible against party to whose attorneys it was addressed, and who denied having received it, in absence of proof that it was written or mailed.

4. **Reformation of instruments** ⬥◯⬦45(2)—**Reformation of contract is not justified, unless proof of original agreement and mistake in reducing it to writing is clear and convincing.**

Reformation of written contract is not justified, unless proof of original agreement and mistake in reducing it to writing is clear and convincing and mere preponderance of evidence is insufficient.

5. **Reformation of instruments** ⬥◯⬦25—**Where lessee's draft of proposed lease was not accepted by lessor, who drafted new one, omitting provision for cancellation of lease on sale of property, lessee was not precluded from denying existence of antecedent agreement containing such provision.**

Where draft of proposed lease, submitted by lessee, was not accepted, and lessor's new draft, prepared with assistance of his counsel,

omitting provision for cancellation in case of sale, was executed, *held*, that lessee was not precluded, in action to reform lease for mistake, from denying existence of antecedent agreement that sale would cancel lease, because he failed to recall letter including such provision in his offer to lease.

6. **Corporations** ⬥◯⬦428(8).

Corporate lessor *held* chargeable with knowledge of terms of lease possessed by its employee, who carried on negotiations respecting it.

7. **Reformation of instruments** ⬥◯⬦25—**Lessor's failure promptly to notify lessee of alleged erroneous omission of provision for cancellation of lease on sale of premises for over a year, and until after sale, held to preclude reformation.**

Lessor, on discovering that trapping lease erroneously omitted provision for its cancellation on sale of property, *held* bound promptly to notify lessee thereof and claim correction, and its failure to do so for over a year, and until after sale of property, with other circumstances, precluded it from obtaining reformation.

In Equity. Suit by the Texas Company and another against the Rosenthal-Brown Fur Company, Inc., and another. Decree for defendants.

C. H. Blish and Hampden Story, both of Shreveport, La., for complainant Texas Co.

Kennerly, Williams, Lee & Hill, of Houston, Tex., and Pujo & Bell, of Lake Charles, La., for complainant Orange-Cameron Land Co.

Cline & Plauche and Cullen R. Liskow, all of Lake Charles, La., for respondents.

DAWKINS, District Judge. On the 10th day of July, 1922, J. L. Du Mars, who then appeared as the record owner of some 137,235 acres of marsh lands, situated in Cameron parish, Louisiana, entered into a contract of lease with Charles W. Brown, whereby the latter was given the right, for a period of 10 years, to possess and use said property "exclusively and only for the purpose and none other of trapping, capturing, and securing fur-bearing animals," and in return was required to protect it against trespassers and to pay said owner, for the privilege of trapping, 2½ per cent. of the gross proceeds of the sales of said furs, but with the obligation to pay a minimum consideration of $1,500 per year. Thereafter Du Mars acknowledged that the title to the property had been taken in his name, for the use and benefit of and as the agent of the Texas Company, and conveyed the same to it accordingly. Brown likewise subsequently made a conveyance of

his rights under the lease to Rosenthal-Brown Company, a partnership composed of himself and Maurice Rosenthal, and that firm in turn later transferred the lease to the Rosenthal-Brown Fur Company, Inc., a corporation. In the said lease, among other things, it was provided as follows:

"It is further mutually understood and agreed that the party of the first part reserves the right to sell any and all of said property at any time during the ten (10) years of this lease, or to use the same for pasturing and farming purposes, the drilling of wells for oil and gas and other minerals, and to carry operations thereon for the production of oil or gas or other minerals, and to erect storage tanks, buildings, structures, and other works, pipe lines and other things thereon necessary or incidental in the production of such oil, gas, or other minerals. It is provided, however, that, in the event, should said trapping operations interfere with the party of the first part, the party of the first part may, at his option, cancel, annul, and set aside this lease in so far as the properties to be so affected are concerned. * * * It is further understood that these presents are binding upon the successors and assigns of the respective parties hereto."

Subsequently, on September 7, 1923, the Texas Company, having acquired the record title as aforesaid, executed in favor of the Rosenthal-Brown Fur Company, Inc. (hereinafter called the Fur Company), what was termed a "grazing" lease upon the same lands, for a period of three years, in which it was expressly provided that:

"It is distinctly and mutually understood and agreed that the party of the first part reserves the right to sell any or all of said property at any time during the term of this lease, free from its provisions should the purchaser so desire, and to use any part or all of said property for the drilling of wells for oil, gas, or other minerals, and carrying on operations thereon for the production of oil, gas, or other minerals, and for the erection of storage, buildings, structures and other works, pipe lines, and other things thereon necessary or incidental in the production and marketing of such oil, gas, or other minerals, and that, in the event the grazing privileges herein granted interfere with the party of the first part in any of said operations, or in any sale it desires to make, the party of the first part, or its vendee, may, at its option, annul and set aside this lease in so far as the property to be so affected is concerned: Provided that, in case of such cancellation, the party of the second part shall be allowed a proportionate reduction of the rental and consideration herein stipulated, which said reduction shall be in proportion to the lands affected by said annulment or cancellation."

The Texas Company decided early in 1924 to sell the property with reservation of the mineral rights, and accordingly corresponded with the Fur Company with that end in view, but the latter found itself unable to finance the purchase. It then conducted similar negotiations with others, with the result that on November 8, 1924, the Texas Company executed in favor of the Orange-Cameron Land Company (hereinafter called the Land Company) an act by which it "granted, bargained, sold, and conveyed * * * all of the surface of (not to include the minerals and mineral estates hereinafter reserved and excepted), in, and to those certain tracts or parcels of land situated in Cameron parish," embracing the same property previously leased to Brown and the Fur Company.

Thereupon correspondence was exchanged and negotiations had between the Texas Company and the Land Company, on the one part, and the Fur Company, on the other, looking to a surrender of possession of the property. This having been declined, the original bill of complaint herein was filed by the Texas Company and the Land Company jointly, November 28, 1924, seeking to oust the Fur Company from the premises. After setting forth the facts above enumerated, it was alleged that, in the original lease between Du Mars and Brown, the former had been granted "the right to sell any and all land described in said lease at any time during the 10 years after the date thereof, and that said reservation, agreed to by the said Charles W. Brown, vested the Texas Company with power and authority, in the event of sale of the premises, and the desire of the purchaser to rescind and cancel said lease." And in said bill it was further alleged as follows:

"And, alternatively, in the order below set forth, your orator, the Texas Company, shows that, should the court hold, upon a proper interpretation, that the reservation as incorporated in the lease did not import a cancellation and rescission of the lease in case of the sale and demand of the purchaser for cancellation, then and in that event it is averred that the purpose and the mutual understanding and the intention of the parties thereto, and to the knowledge of the Rosenthal-Brown Fur Company, Inc., and those from whom it acquired said lease, though it

be not expressly recited in said lease, but omitted through mutual mistake and inadvertence, that the said lease, in the event of a sale of any and all of the lands described therein by J. L. Du Mars, would terminate and thereafter be of no force and effect. And further, alternatively, should the court hold that the reservation incorporated in the lease did not import a rescission and cancellation of the lease in the event of sale and the demand of the purchaser for cancellation, then and in that event, that the purpose, understanding, and intention of your orator, the Texas Company, in reserving the right to sell said property, or any portion thereof, during the life of the lease, was that such sale should, upon demand of the purchaser, operate the cancellation and rescission thereof, and that there was a mistake on the part of J. L. Du Mars, as agent for the Texas Company, in not so expressly providing, and that the conduct of the defendant in refusing to recognize such cancellation is inequitable."

The Texas Company also alleged that it was bound in warranty unto the Land Company to deliver said property "in compliance with the demands of the latter, made for that purpose"; that the "surface of said land has been sold" to the Land Company, and it desired to have the leases canceled "for the reason that the said leases cast, operate, and are a cloud upon the title, and are incumbrances upon the property so conveyed"; that the Fur Company was "still claiming rights to trap and take the fur-bearing animals from said lands under said lease, and is interfering hindering, and molesting the said Orange-Cameron Land Company in the exercise and enjoyment of its rights of possession and ownership of the surface of said property conveyed to it by the Texas Company"; and that said acts were causing great damage and irreparable injury, entitling complainants to the writ of injunction for the protection of said rights.

Complainants prayed that said leases "be rescinded, set aside, annulled, and held for naught," and in the alternative that the trapping lease of July 10, 1922, "be reformed and made to conform to the true intent, purpose, understanding, and agreement of the parties thereto, and those in privity therewith, and, as reformed and recast, that said reservation be held to authorize the rescission and cancellation of said lease of July 10, 1922"; further, in the alternative, that if the court should find that the same did not import a cancellation and rescission, then the Texas Company prayed that the court

hold and decide "that the purpose and mutual understanding and the intention of the parties thereto, and to the knowledge of the Rosenthal-Brown Fur Company, Inc., and of those from whom it acquired said lease, though not expressly recited therein, was omitted through mutual mistake and inadvertence, and that said lease, because of the sale of the land therein described, * * * terminated such lease and is null, void, and of no further force and effect"; and further, in the alternative, that if the court should find that the said reservation did not import a rescission and cancellation as aforesaid, "in the event of the sale of the land and demand of the purchaser for cancellation," then the Texas Company prayed that the court decide and hold "that the purpose and understanding of J. L. Du Mars, its agent, acting for it in executing the lease" of July 10, 1922, "in reserving the right to sell said property, or any portion thereof, during the life of said lease, was that such sale should, on demand of the purchaser, operate a cancellation and rescission, and that it was a mistake on the part of J. L. Du Mars, agent of the Texas Company, in not so providing for the same in said lease; and that the conduct of the defendant in refusing to recognize such cancellation is inequitable, and that such lease should be canceled," and the defendants forever enjoined from setting up claim to the said property, and that the Land Company be held entitled to the undisturbed possession thereof. Complainants finally prayed for a preliminary injunction enjoining the respondents "to desist and refrain from interfering with, hindering, and molesting" the Land Company in the enjoyment of its rights of ownership and possession and after hearing that the said writ be made perpetual.

On the same day, November 28, 1924, complainants filed an amended bill, in which it was alleged that since the drafting of the original the defendants had "unlawfully entered upon the property acquired by co-complainant, Orange-Cameron Land Company, * * * and are trapping fur-bearing animals thereon, converting and appropriating the pelts to their own use and benefit, and shipping or preparing to ship the same beyond the jurisdiction of this court," and concluding with the prayer that the pelts be sequestered, and for the issuance of a temporary restraining order, without notice, prohibiting the defendants from further committing such acts and upon hearing for a preliminary injunction pendente lite. The court declined to issue the restraining order, and upon hearing refused the preliminary

injunction, for the reason that, in its judgment, to have done so would have had the effect of ousting defendants and changing the possession of real property by the writ of injunction without full hearing upon the merits, contrary to well-settled principles of jurisprudence.

Again, on January 3, 1925, complainants filed a second amended bill in which the correspondence and negotiations resulting in the original lease of July 10, 1922, were set out in detail, and the allegations made that "the antecedent contract between" Du Mars and Brown was that, if at any time before its expiration the former should see fit to sell or to use the lands for private purposes, the lease at his option should be terminated, and which understanding constituted the "true agreement of the parties, but that the formal contract of lease, dated July 10, 1922, when drafted and executed, was expressed in terms different from the antecedent agreement evidenced by the letters aforesaid, in that the reservation of the right to sell as expressed in the lease omitted as a part thereof the agreement of the parties that such sale would terminate the lease at the option of the said Du Mars," but notwithstanding said omission, the legal import and effect of the reservation in the lease as drafted "vested in Du Mars the right, in the event of sale at his option, to terminate the lease; that, if the said lease on its face did not import such legal effect, then there was mutual mistake, as the letters exchanged between the parties clearly evidenced the intention to so provide, but by mutual mistake and inadvertence that part of the reservation providing for cancellation in event of sale" was not written into the contract as agreed upon; that the executed lease was expressed in terms different from the antecedent written agreement between the parties, and if it does not import a cancellation upon sale "then there was no meeting of the minds of the parties to the lease contract as written, and by being so written down an unconscionable contract and a case of great hardship have resulted to complainants," and for the reasons stated it should be reformed and rewritten, and, having been so reformed, it should be held to have terminated; further that, if the court should find the case to be as previously stated, then, in view of the facts, there had been a mistake on the part of Du Mars who believed that the lease did provide for its cancellation by the sale at his option, and that the conduct of defendants "in view of the antecedent contract, as evidenced by the letters hereinabove referred to as Exhibits A, B, and C, is unconscionable and said lease should be canceled and rescinded."

In making their return to the rule for a preliminary injunction, respondents also answered at length the averments of the original bill, in which, in effect, the execution of the contract of July 10, 1922, was admitted but the allegations of extraneous facts were denied. It was conceded that the "grazing lease" had been canceled by the sale of the surface rights, but respondent, Fur Company, averred that its privileges under the trapping lease had not been affected thereby; that it was still in actual possession, exercising those rights, and the complainants should be enjoined from interfering therewith.

A number of demurrers and exceptions were filed by both sides, all of which were overruled, except a plea of estoppel by the complainants based upon the correspondence preceding and subsequent to the making of the contract of July 10, 1922, and the latter was referred to the merits. The case was tried last spring, but on account of absence of the judge from the district was not argued and submitted until September 29, 1925.

It is contended by complainants, first, that under the provisions of the contract of July 10, 1922 (hereafter referred to as the trapping lease), hereinabove quoted, the sale of the surface of the land to the Land Company had the effect of canceling the trapping lease, or at least of giving to the purchaser the right to cancel at the latter's option; second, that, if the language used does not have that effect, then there was mutual mistake between Brown and Du Mars in omitting to include that right, and the contract should be reformed accordingly; and, third, if it should be found that there was no mutual mistake, then there was error or mistake on the part of Du Mars, with the result that there was no meeting of the minds of the parties, to the knowledge of respondents, and the latter should not be allowed to take advantage of that error, and the lease should be canceled.

On the other hand, respondents contend that there is no ambiguity in the contract, but that the same clearly grants to the lessee and his assigns the right, for a period of 10 years, to use the land for trapping purposes, subject only to the right to cancel if such operations should interfere with the complainants in their explorations for oil, gas, etc., and then only upon the property so affected.

[1] Undoubtedly the provisions of the lease quoted do not say expressly either that a sale

shall have the effect of cancellation or of granting to the purchaser the right to do so at his option, and that right can only be inferred from the reservation of the power to sell. It is not pretended—in fact, appears to be conceded—that if Du Mars or the Texas Company, for whom he was acting and who afterwards expressly made itself a party to the said lease, had remained the owner of the land, the rights of respondents would have continued for 10 years, subject only to being canceled if the same interfered with operations for oil and gas or other minerals; hence the expression in the portion of the trapping lease quoted above, "should trapping operations interfere with the party of the first part," he "may" have the option of canceling the lease "in so far as the properties to be so affected are concerned," would seem to have had reference alone to "interference" with the mineral operations. And then, when in the last paragraph of the lease it is said, "It is further understood that these presents are binding upon the successors and assigns of the respective parties hereto," the conclusion seems irresistible that it was intended whatever rights or obligations were being acquired or imposed were to pass to their respective transferees. Otherwise this last-quoted clause is clearly inconsistent with the idea that a sale alone should ipso facto cancel the lease.

I, of course, recognize that ordinarily the law, in the absence of clear intention to the contrary, in dealing with matters of this kind, gives the right of assignment to either side, with the same effect as the last-quoted stipulation, and that its use in such instances is superfluous. But here it is contended that the reservation of the power to sell meant to sell free from the lease, at least at the option of the purchaser, and when that construction is attempted there at once becomes apparent an irreconcilable conflict between the two expressions. If the right to assign was to have its ordinary effect, it would simply mean that the assignee should have no greater nor lesser rights than his assignor, in which event there would have been only a privilege of cancellation for interference in the manner indicated; that is, as to mineral operations. Where, in the wording of the contract, is it made to appear that the extent of the right to cancellation should be any broader in the hands of the purchaser than it was while the property belonged to Du Mars or to his principal, the Texas Company? If the bare fact of sale was not to work ipso facto a cancellation, then we look in vain for the expression

in the contract of any such option on the part of the purchaser.

I am inclined to the view, and believe that the authorities cited by complainants reasonably sustain that position, that ordinarily under the common law, where in a contract of lease the right of sale is reserved, the effect is, upon sale, that the lease is canceled. However, in the present case, not only is that idea expressly negatived by the last clause, but by a codal provision such right of the lessor must be clearly expressed. R. C. C. art. 2733, provides: "If the lessor sells the thing leased, the purchaser cannot turn out the tenant before his lease has expired, unless the contrary has been stipulated in the contract."

Then again the Code, in article 2474, dealing with sales, which has been held to apply to leases (and which is but a legislative expression of the uniform rule of jurisprudence for the interpretation of contracts) provides: "The seller is bound to explain himself clearly respecting the extent of his obligations; any obscure or ambiguous clause is construed against him." See, also, Murrell v. Lion, 30 La. Ann. 255; 24 Cyc. p. 915.

But it is said the parties must have had some object in view in putting into the lease a reservation of the right to sell at any time during its term, for otherwise it was unnecessary, the lessor having that power without such stipulation, to sell subject to the lease. This is a very strong argument, and the one which has occasioned most concern (outside of the tangled condition of the facts disclosed by the acts and doings of the parties before and since the lease) in reaching a just and fair decision of the case. Of course, the stipulation must be given effect, if possible. It must not be overlooked, however, that the contract was somewhat unusual, in that, while it was for a period of ten years, nevertheless the lessor (who was acting for the Texas Company, a large producer and refiner of crude oil) had purchased it mainly for its possible mineral value, and, while willing to lease for trapping purposes, did not wish to hamper its own right or that of its transferees to use the property for mineral operations; hence there was reserved the very flexible privilege of cancellation if and to the extent that trapping might interfere with explorations for this particular purpose.

Would it be unreasonable to say, therefore, that by the reservation mentioned it was merely intended to preserve and hand down to assignees these same broad powers within the limits mentioned? I think not. Applying the rules of construction cited, if

the case is decided upon the face of the contract, I believe the conclusion must necessarily be against the contention of complainants, and this, too, without ignoring any provision of the contract.

[2] I turn now to the extraneous facts and circumstances surrounding the trapping lease, which it is contended show the making of a different antecedent contract from that expressed in the document signed and of the error in omitting it therefrom. Negotiations for the leasing of the property for trapping purposes were first initiated by a letter from the attorneys for Brown, addressed to Du Mars, in which it was plainly stated that whatever contract might be made should contain a reservation of the right to sell the land free from the lease, or of cancellation at the option of Du Mars, if it in any way interfered with his operations for mineral purposes. That letter was as follows:

"We have been advised that you own large tracts of marsh lands in Cameron parish, Louisiana. We have some clients who are extensively engaged in trapping and marketing of furs. They are probably the largest trappers and fur dealers in this section of the country. At this time they are locating an army of trappers, equipping up-to-date camps, etc., on the large tracts of marsh lands which they already have under lease. We apprehend that the marsh lands owned by you are practically nonrevenue producing and perhaps do not even pay their own taxes. Our clients would like to lease these lands for trapping purposes, for a period of 10 years, if possible, with recitals in the lease to the effect that if, at any time before the expiration of this period, you should wish to sell any part or all of the lands, or to use them for your own private purposes, the lease, at your option, would be terminated. Our clients have figured the matter out very carefully, and have decided that they could make a reasonable profit from their operations and at the same time pay to you, for the rental of the lands, 2½ per cent. of the gross proceeds from the sales of furs captured on these lands. This would amount to a considerable sum of money, since the entire properties would be supplied with trappers sufficient to adequately cover all of the territory. Our clients will likewise obligate themselves to allow no firearms to be used on the property, and to report to the authorities all violators of such laws pertaining to trespassing, etc., that may at any time be in effect. In other words, they will act as a sort of police guard for the property.

"We have had no difficulty in inducing other individuals and large corporations to lease their properties to us under similar contracts, and trust that we may hear from you on the subject. Every facility will be afforded you or your agents to keep in touch with the operations, and the books, which will be strictly kept, will always be open to you for inspection. Trusting that we may hear from you within a reasonable time, as the trapping season is approaching, we are."

[3] Complainants attempted to introduce in evidence what was claimed to be a reply by Du Mars to the letter just quoted, consisting of an undated carbon copy of a communication from Du Mars to Cline & Plauche, marked for identification "Plaintiff K"; but its reception was objected to upon the ground that it had not been proven. Both Cline and Plauche denied having received it, and the only showing made of its authenticity was that it had been found in the files turned over by Du Mars before his death, in the course of business, to his superior officer, Culver. There is no other proof that it had been written, and none that it had been mailed or communicated to Brown or his attorneys, but, on the contrary, as stated, express denial of its receipt. Hence the objection was sustained and the document excluded. However, there was properly proven and introduced in evidence copy of another letter from Du Mars to Cline & Plauche, bearing date June 15, 1922, which the latter admitted receiving, and which referred to their communication of the 13th (neither the excluded nor admitted communications making any reference to each other), reading as follows:

"Yours of the 13th inst. in regard to trapping lease on Louisiana land received. I would like some definite information. You say that 2½ per cent. of the gross proceeds from the furs captured on these lands would amount to considerable since the entire property would be supplied with trappers sufficiently adequate to cover all the territory. I would like some reasonably definite estimate of what that would amount to per year, as since receipt of your letter I have an offer couched in dollars and cents from a party in Orange, who desires all the land I own in the third, fifth, and sixth wards, which comprises the entire tract of 137,235 acres. Also, what assurance I would have, without a great cost, of a fair count? Parties who are leasing large bodies of land in that country would have every opportunity in the world to shift figures from one section to the other, or to mix pelts from one ward to another. However, business of that sort can

be conducted honestly, if parties are so determined. Hoping to hear from you soon fully on these questions, I am."

In response thereto, on June 26th, Cline & Plauche wrote Du Mars (omitting irrelevant portions) as follows:

"Mr. C. W. Brown wishes us to confirm by this letter the proposition he made to you for the leasing of your Cameron parish property for trapping purposes. On the basis of 137,235 acres, Mr. Brown will obligate himself to pay you the minimum rental of $1,500 cash per year, provided that, if 2½ per cent. of the gross proceeds from furs captured on these lands shall exceed that amount, he will likewise pay you the difference; settlements to be made January 1st and March 1st. * * * We are inclosing herewith a draft of a lease prepared for one of the companies from whom Mr. Brown is leasing a large tract of land, which we think will meet the conditions of the present case, except that the consideration referred to in this instrument is for 2½ per cent. royalty, without reference to any cash consideration. This clause, of course, may be changed to meet the requirement. We will say in this connection that, if the instrument we are sending you is not satisfactory, you may have your attorney prepare one, and submit same to us for examination. Kindly let us hear from you as early as may be possible."

On July 1, 1922, Du Mars acknowledged receipt of the proposed lease prepared by Cline & Plauche, saying:

"Yours of late date, together with sample lease, received. I have intrusted the entire file to my Louisiana attorney, and requested him to look over the sample lease and draw instrument as per the conditions outlined in our correspondence. I expect to receive communication from him, together with the instrument drawn in accordance with Louisiana laws, within the very near future, and will take the matter up with you as early as possible, in response to your desire that Mr. Brown may have all the time possible for his preparations before the season opens."

And on July 3d Du Mars, having communicated with his counsel and submitted the proposed form of lease, wrote Cline & Plauche as follows:

"Herewith hand you carbon copy of a lease drawn as per verbal contract, or as near thereto as possible, which I submit to you for your opinion. If this is entirely satisfactory to you, you may return same and I will forward to you executed duplicate originals, one to be retained by you the other to be returned to me for my file. * * * If you have other suggestions to offer in the matter in the body of the lease, please be frank in stating same."

Cline & Plauche, on July 5th, acknowledged receipt of the last-quoted letter, but informed Du Mars that the copy of lease had not been received, and under date of the 6th the latter apologized for the oversight and inclosed the omitted form, concluding with the statement, "I have original lease prepared, with description of the land, for signature upon your favorable decision of this copy." On July 7th, Cline & Plauche wrote as follows:

"We wish to acknowledge receipt of yours of the 6th inst., inclosing draft of lease on your Cameron parish property for trapping purposes. In this connection we shall say that the draft inclosed is entirely satisfactory to us and has been indorsed by our client. We would therefore request that you execute the lease in duplicate originals, forwarding both copies to us to be executed by Mr. Brown. After Mr. Brown has signed, one of the copies will be returned to you. You will kindly attach to both copies full description of the lands affected thereby. Trusting that we may receive the leases for Mr. Brown's signature within the next few days, and with best wishes, we remain."

On July 11th Du Mars acknowledged receipt, inclosing duplicate originals of the lease as finally drafted, which he said was "as per our correspondence." He also requested return of the form which had been sent to Cline & Plauche, and on July 12th the latter wrote, acknowledging receipt of the originals, stating that both had been signed by Brown, and Du Mars' copy was being returned, along with the lease form previously sent.

On January 13, 1923, the Texas Company wrote Brown, informing him that Du Mars had transferred to it the property in question and saying: "Mr. J. L. Du Mars has conveyed to this company the 137,235 acres covered by the trapping lease which he executed to you on July 10, 1922, and you should therefore account to us henceforth as contemplated by the provisions of said lease."

This was acknowledged by Brown for the firm of Rosenthal-Brown Fur Company, and in his letter it was said: "We note that Mr. J. L. Du Mars has conveyed to your company this land, and we will continue to carry out the provisions of our lease with your company, that we originally made with Mr.

Du Mars, which we trust will be satisfactory to you."

This covers the documentary evidence as to what took place between the parties in connection with the execution of the lease, up to the transfer of the property of the Texas Company. In addition to this, Brown testified that he was in Houston, Tex., where Du Mars was employed by the Texas Company, a few days after the writing of the first letter of Cline & Plauche, and had a personal interview with Du Mars, in which the terms of the lease were discussed; that nothing was said about the right to cancel in event of sale, but that "the agreement reached between Du Mars and myself was that, if trapping operations interfered with pasturing or oil development, pipe lines, and farming, it should be canceled on those lands which were so affected." He admitted, however, that he did not tell Du Mars that he had disapproved the clause in the original letter of Cline & Plauche, expressing a willingness to have the lease canceled at the option of Du Mars, in event of sale.

In explanation of the language used in the first letter of Cline & Plauche to Du Mars, which undoubtedly indicated a willingness by Brown to lease the land, with the right of cancellation at the option of the lessor in event of sale, Cline testified that the same had been written by him in Brown's absence; and when the latter returned and read it he objected seriously to the cancellation provision. However, admittedly, neither of them ever communicated to Du Mars this objection, and the lease was finally executed in its present form, without further explanation of the failure to include that provision in it, other than what appears from the testimony of Brown to have been agreed upon at the meeting in Houston. Du Mars having died before the trial, the court was denied the benefit of his testimony.

Up to this point we have a situation where a definite proposition was made by one party to the other, with express provision for cancellation, and its acknowledgment by the latter without referring thereto, although raising other issues in connection with the proposal, the subsequent submission of the proposed lease, and its revision by the lessor and his attorney to meet their wishes, and which omitted the use of the language contained in the original letter or proposal as to cancellation, but simply reserved the right to sell. Under the circumstances, the situation is the same as if Du Mars had originally submitted his own proposition for acceptance by the lessee, and as to which all

doubt or ambiguity would be construed against the lessor. In other words, there was an offer embracing certain terms, with a counter proposition which omitted some of those provisions, and, of course, when accepted by the first proponent, the latter proposal became the contract of the parties, instead of the original offer. Therefore I think the evidence falls short of showing that there was a clear and specific antecedent agreement between the parties different from that which was embraced in their signed contract.

[4] It is, of course, well settled that to justify a court in reforming a contract, the proof of both the original agreement and the mistake or error in reducing it to writing must be clear and convincing. Simmons Creek Coal Co. v. Doran, 12 S. Ct. 239, 142 U. S. 417, 35 L. Ed. 1063; U. S. v. Milliken Imprinting Co., 26 S. Ct. 572, 202 U. S. 168, 50 L. Ed. 980; Otis v. Texas Co., 96 So. 1, 153 La. 394; William Cramp & Sons Ship & Engine Bldg. Co. v. United States, 36 S. Ct. 70, 239 U. S. 221, 60 L. Ed. 238; Medical Society v. Gilbreth (D. C.) 208 F. 899.

As stated by the Supreme Court, in Philippine Sugar Estates v. Government of the Philippine Islands, 38 S. Ct. 513, 247 U. S. 385, 62 L. Ed. 1177: "Reformation [of a written instrument] will not be granted, unless the proof of mutual mistake is 'of the clearest and most satisfactory character.'" And: "The burden of proof resting upon the appellant cannot be satisfied by mere preponderance of the evidence. It is settled that relief by way of reformation will not be granted, unless the proof of mutual mistake be 'of the clearest and most satisfactory character.' Snell v. Insurance Co., 98 U. S. 85, 89, 90 [25 L. Ed. 52]; Baltzer v. Raleigh & Augusta Railroad, 6 S. Ct. 216, 115 U. S. 634, 645 [29 L. Ed. 505]; Maxwell Land-Grant Case, 7 S. Ct. 1015, 121 U. S. 325, 381 [30 L. Ed. 949]; Simmons Creek Coal Co. v. Doran, 12 S. Ct. 239, 142 U. S. 417, 435 [35 L. Ed. 1063]; Campbell v. Northwest Eckington Co. [33 S. Ct. 796], 229 U. S. 561, 584 [57 L. Ed. 1330]."

[5] It is in effect argued that, after having written the original letter and failing to recall that portion for cancellation, Brown must have known that Du Mars thought and intended that the language used would have that effect, and cannot, in view of his conduct and the manner in which the stipulation was subsequently treated by the parties (which will later be discussed in this opinion), now be heard to say that it did not mean just that. But Du Mars did not stand

or reply upon the draft of the lease as submitted by Brown, but, acting under the advice and with the assistance of his counsel, rewrote and returned it to Cline & Plauche as representing what he himself was willing to do. It might be, if Du Mars were living, he could supply the proof, which I think is lacking, that he and Brown reached a definite antecedent understanding that the lease was to be canceled upon sale; but, however unfortunate his death may have been, the court cannot assume that he would so swear, especially in view of the language in the lease itself contradicting that intention.

I conclude that the proof fails to show either that there was a definite antecedent agreement or that there was mistake in not expressing it in the written contract. This leaves only the question of ambiguity, for the solution of which it is contended the court should, in construing the lease, consider the conduct of the parties, as representing the interpretation which they themselves put upon their contract.

About a year after the execution of the trapping lease, the Texas Company finding that it could lease the same land, or a portion thereof, for grazing purposes, without violating the terms of the trapping lease, certain correspondence was had with respondent which finally culminated in an agreement to pay $6,000 for the privilege, although it (the Fur Company) did not, and has not as yet, so far as the record discloses, used the property for grazing purposes.

The idea in obtaining the grazing lease, as stated by the agent of the Texas Company in the correspondence, was to give the Fur Company entire control of the surface for all purposes other than exploration for oil and other minerals. The form was drawn by Cline & Plauche for that purpose, following the same general lines as the trapping lease, except that it was to cover the grazing privileges, and submitted to Culver, for the Texas Company. In transmitting this form to the Texas Company, Cline & Plauche wrote: "In drawing this contract, we followed the form of the trapping lease prepared by your company, and incorporated every provision found in the trapping lease which would possibly be incorporated in the present lease. This was at the request of Mr. Bates." However, the form was changed by Culver with interlineations, so as to expressly provide that the Texas Company "reserves the right to sell any or all of said property at any time during the term of this lease, free from its provisions should the purchaser so desire. * * * "

12 F.(2d)—20

[6,7] This letter was written August 30, 1923, and must have drawn to the attention of the Texas Company at that time, that the trapping lease did not contain the broad provision for cancellation just quoted, else the additional matter would not have been inserted. There must also have been some doubt in the mind of Culver as to whether the right to cancel the trapping lease upon sale existed, and, if a mistake had been made, it was the duty of the Texas Company, upon discovering the fact, to promptly direct attention to it and claim correction; but, like Brown, in the case of the first letter, Culver remained silent. His principal must be charged with the effect of his knowledge, and having waited more than a year thereafter, and after the attempted sale of the same surface rights described in the grazing lease, which also referred to the trapping lease, I think it (the Texas Company) is precluded from asserting at this late hour either that there was mutual mistake or error upon the part of Du Mars. The clause in the grazing lease referring to the trapping lease is quoted as follows:

"It is understood between the parties hereto that the party of the second part is now the owner of a certain lease originally granted to Charles W. Brown by J. L. Du Mars, trustee, under date of July 10, 1922, giving and granting unto the party of the second part the exclusive right to trap, secure, and capture fur-bearing animals on said lands, under certain terms and conditions as more fully set out in said lease, and that the purpose of the present lease is to grant, demise, and let unto the party of the second part the exclusive grazing privilege on said lands; it being understood between the parties hereto that the grazing privileges and rights herein granted, together with the trapping rights heretofore granted to the said Charles W. Brown and now owned by party of the second part, shall give to the party of the second part the control of the surface rights on said lands other than those rights which are specifically excepted herein, to wit."

It is true that thereafter, and in the correspondence passing between it and the Fur Company, the Texas Company asserted, and the former admitted, that a sale of the land would work a cancellation, as will be seen from the following excerpts from the correspondence:

On January 9, 1924, Culver wrote to the Fur Company in part as follows: "I am in receipt of inquiries from persons interested in handling the sale or purchase of this 137,-

233.42 acres of land, and feel, *since your grazing and trapping lease would be subject to cancellation in the event of sale,* that you should be advised of the price that we have made in answer to such inquiries."

And on January 14th of the same year the Fur Company replied, in no wise disputing this statement, but saying, among other things: "We will ask that, in the event you sell all or a part of your holdings in Louisiana, *which would affect us in any manner,* that you kindly inform us of that fact and the name of the prospective purchaser in time for us to negotiate for a perpetuation of our existing privileges thereon. We would also appreciate it if you would drop a good word, in our behalf, to your vendee, as we feel sure that a word from you would very materially assist us in securing a renewal of our privileges."

The record shows that this last letter was written by Mr. Plauche, who, in addition to being one of the attorneys for the Fur Company, was financially interested therein. He testified that, in using the expression that if the sale should be made "which would affect us in any manner," he had in mind the grazing lease. However, the letter of Culver, to which he was replying, very plainly asserted that a sale would cancel "your grazing and *trapping* lease." To say the least, this was rather inconsistent with the position now taken.

The sale to the Orange-Cameron Land Company was signed on November 8, 1924, but Brown must have learned that it was in prospect shortly before, for on the 6th of that month he wrote the Land Company as follows:

"We are informed that you have purchased the land holdings of the Texas Company in Cameron parish. You are of course aware that this corporation has had the trapping privileges on these lands leased for several years, and we of course know that the purchase of these lands cancels our trapping lease on same; therefore, considering the nearness of the present trapping season, as well as the large area of land and the inaccessibility of a great deal of it, and the time and expense it would necessarily put you to, to erect camps and take possession to actually trap it, we therefore decided to write you and suggest that we would be pleased to make this suggestion. * * * "

The suggestion made was for an exchange of rights upon certain other lands for those upon the Texas Company lands. However, the next day he wired the Land Company, recalling the last-mentioned letter, as per the following telegram: "Disregard our letter yesterday November sixth. Letter was written under misapprehension of facts and in error on my part which error was caused on account of not being familiar with terms of trapping contract from Du Mars and the Texas Co. Cancellation by sale from the Texas Co. applies only to our grazing privileges and not to our trapping rights. These rights under contract not subject to cancellation consequently offer contained in said letter withdrawn. May discuss matter with you further at later date."

In explanation of the writing of the letter of November 6th, Brown testified that, at the time of learning of the prospective sale, he was engaged in the trial of litigation between his company and the Orange-Cameron Land Company at Lake Charles; that at the noon hour he visited his office, obtained from his files one of the leases, and took it to lunch with him, which happened to be the grazing lease, and in reading it he found that a sale would work a cancellation, and, believing that it had been couched in the same terms as the trapping lease, wrote the letter in question without reading the latter lease; that he and Mr. Plauche later read the trapping lease, and the telegram recalling his letter of November 6th was sent. This message was received at Orange, Tex., the residence of the Land Company, at 6:35 p. m. on November 7th, and presumably reached the Land Company before the act of purchase from the Texas Company was signed on the following day.

There must have been some doubt in the minds of both the Texas Company and the Land Company as to the meaning of the provision in the trapping lease, for it was shown by the testimony of representatives of these two companies that both the original letter of June 13, 1922, and that of the Fur Company of January 14, 1924, were submitted to the Land Company to assure it that the sale would free the land from respondent's leases. However, all doubt as to what the contention of the Fur Company would be was removed by the telegram of November 7th, received before the deed was signed.

It was shown that the Fur Company, upon the faith of its trapping lease, had expended a large sum of money in equipping and preparing the land for that purpose; that it was one of the pioneers in the fur business, on a large scale, in that community, and that it and its counsel had joined forces with others similarly situated in an effort to have the courts of Louisiana sustain the right of owners of such property to exclude the

public therefrom, and to have the trapping privileges recognized as entitled to the same protection as any other private property. This position was finally sustained by the Supreme Court of Louisiana, in which decision the writer of this opinion participated. Buras v. Salinovich, 97 So. 748, 154 La. 495. This result had been accomplished prior to the sale to the Land Company, and the value of the property for that purpose, accordingly, greatly enhanced. The increase in value is fully evidenced by the fact that in the sale to the Land Company, which, in view of the character of the land, conveyed practically the same rights which were enjoyed by respondents under their two leases (those retained by the Texas Company for all practical purposes being the same in each instance) was sold for a consideration of $411,-699.50, $50,000 of which was paid in cash and the balance made payable in 15 equal installments, with interest at 5 per cent.; whereas, the consideration then being received from the Fur Company was $7,500 per year, and such sum as would be realized from the 2½ per cent. upon the gross sales of furs produced.

This disclosed a very strong reason, one which as a rule influences greatly human action, on the part of the Texas Company, for wishing to free the property from respondent's trapping lease, to wit, a much larger consideration.

It is very strongly urged that the contract with the Land Company was not a sale, but a subterfuge, couched in the language used to give it that name, but in reality, because of the nature of the land, conveying only the rights which were then being enjoyed by respondent Fur Company; the object being to have the transaction come within the definition technically, of a sale. This may be true, but notwithstanding such contention, I think, when all of the circumstances are taken into consideration, there was so much inconsistency on each side, both of conduct and of statements, that, when well-recognized rules of interpretation are applied, the court cannot say that anything appears to justify it in doing other than to construe the language as it is written without regard to extraneous matter. Whatever estoppel may have arisen upon the original letter of Brown was overcome by his positive testimony as to the understanding subsequently reached with Du Mars in the interview at Houston, as well as by the fact that the lease was finally prepared by the latter and his counsel, reinforced by the further fact that the alleged error, if it existed, must have been discovered with

the making of the grazing lease a year later; the Texas Company thereafter permitting it to stand for another 12 months without attempting to have it corrected. These circumstances, I think, preclude a court of equity from giving relief. Pomeroy's Equity Jurisprudence (3d Ed.) par. 897; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; Miller v. Continental Shipbuilding Corporation (C. C. A.) 265 F. 158; Schafroth v. Ross (C. C. A.) 289 F. 703; In re International Mineral Co. (D. C.) 222 F. 415; Bank v. Seldomridge (C. C. A.) 271 F. 561; Church v. Swetland, 243 F. 289, 156 C. C. A. 69; Ripley v. Jackson Zinc & Lead Co., 221 F. 209, 136 C. C. A. 619; McLean v. Clapp, 12 S. Ct. 29, 141 U. S. 429, 35 L. Ed. 804; Hoyt v. Latham, 12 S. Ct. 568, 143 U. S. 553, 36 L. Ed. 259; Jennings v. Broughton, 5 De Gex, M. & G. 128.

For the reasons assigned, there should be judgment rejecting the demands of complainants, and their suit should be dismissed, except as to the grazing lease, which, admittedly, was subject to cancellation after the sale. The right of respondents to continue their trapping operations under the lease of July 10, 1922, should be sustained, and complainants enjoined from interfering therewith, except to the extent of operations for oil, gas, and other minerals, or for farming or grazing purposes.