**GRAUER v. SCHENLEY PRODUCTS CO.**

District Court, S. D. New York.
March 8, 1940.

Avel B. Silverman, of New York City, for plaintiff.

Chadbourne, Wallace, Parke & Whiteside, of New York City (Leonard P. Moore

226

and Robert D. Shea, both of New York City, of counsel), for defendant.

GALSTON, District Judge.

The plaintiff as the owner of certain letters patent relating to a non-refillable bottle stopper, Nos. 1,934,058, dated November 7, 1933, 1,968,139, dated July 31, 1934, and of No. 2,018,019, dated October 22, 1935, on July 15, 1936, entered into an agreement with the defendant wherein it was provided that the plaintiff have an option to purchase the patents, to be exercised within two weeks after the receipt by the defendant of commercially manufactured specimens of the patented invention. The consideration therefor provided that the plaintiff enter into the employ of the defendant for a period of ten weeks at a compensation of $75 per week, and for the patents, inventions and improvements thereon the defendant was to pay the plaintiff as follows:

"3. (a) A sum equal to the difference between $5,000 and all sums expended by us in pursuance to paragraph 2 hereof (consisting of the total of the salary paid to you plus all other outlays and expenses incurred under said paragraph) to be paid to you in cash at the time of our exercise of the option.

"(b) A royalty at the rate of ½¢ for each bottle upon which said stopper is used up to a total of four million bottles.

"(c) When you have received the total compensation, as provided in paragraphs (a) and (b), no further payments of any sort whatsoever shall be due to you."

On September 1, 1936, the defendant duly exercised the option and paid to the plaintiff $4,340.02, being the sum of $5,000 less the expenses and disbursements allowed under the agreement; and the plaintiff on that day gave the defendant an assignment of the patents. The plaintiff alleges that in or about the month of December 1937 the defendant discontinued the use and manufacture of the patented device and notified the plaintiff that it would not resume manufacture or use of the patented device. Plaintiff alleges that the defendant has refused to pay the plaintiff the balance of $20,000 which he claims is owing to him pursuant to the terms of the agreement, less the sum of $2,348.82 received. It is alleged that the defendant and the defendant's attorney represented to the plaintiff that the agreement between the parties, drawn and prepared by the defendant, obligated the defendant absolutely and in any event to pay to the plaintiff the said additional sum of $20,000 though the agreement did not contain any such fixed obligation by the defendant and did not embody the actual agreement which the plaintiff alleges he made. The plaintiff contends that he executed the agreement in the belief that it embodied an unconditional obligation by the defendant to pay the aforesaid sum of $20,000 in addition to the sum of $5,000 designated in subdivision (a) of paragraph 3rd, and that the provision designated as subdivision (b) of paragraph 3rd did not correctly embody the agreement made.

The defendant asserts that the agreement dated July 15, 1936, fully expresses the undertaking between the parties and denies that there was therein contained any fixed obligation to pay absolutely and in any event an additional sum of $20,000 to the plaintiff over and above the $5,000 referred to in subdivision (a) of paragraph 3rd.

The burden is on the plaintiff to establish that the written agreement does not correctly express the agreement as made, and in order to reform the agreement it is necessary to prove that the written agreement was entered into through a mutual mistake or by fraudulent knowledge and procurement by one party thereto.

It appears that the plaintiff in the years 1932 and 1933 was engaged in designing bottle caps and bottle stoppers and machinery for making caps. In 1932 he submitted samples of non-refillable bottle stoppers to the defendant. Their representatives suggested certain improvements which he adopted. Among others he met Lester Jacobi, president of the defendant's corporation, and told him that he had spent approximately $16,000 in developing his inventions. Apparently negotiations, though they continued at irregular intervals, reached no agreement. Some time thereafter, in June of 1936, the defendant, after a talk with his lawyer, Rubin, was informed that Lester Jacobi desired to get in touch with him. At or during this time, said Grauer, Lester Jacobi asked him what he wanted for the stopper and he replied that Jacobi knew that he had put in $16,000 of his own money and three and a half years of work, and added: "I would be glad to sell it for $25,000 outright," to which Jacobi replied, so testified the plaintiff: "That is a fair price." The last talk prior to signing the contract was on July 14th,

when Jacobi again asked him: "What will you take for the stopper?" Plaintiff said: "I will take $16,000 that I put in. I will take $16,000 cash and the balance of $9,000 you can give me when you sign the contract and you exercise the option." Jacobi answered, so said Grauer: "No, Grauer. I will give you the $16,000 that you put in cash and $9,000 in installments when we start using it." Grauer was instructed to return the following morning, at which time Heymsfeld, an officer and counsel of the defendant corporation, handed the proposed contract to him. Grauer asked: "Do you mind if I call up Mr. Rubin?" (his lawyer), to which Jacobi assented. On telephoning Rubin's office he found that Rubin was out. He suggested that he take the paper and see Rubin or someone else before he signed it, and Jacobi replied, so said the plaintiff, that that was not necessary. "You can take my word for it, the contract is all right. I will explain to you what the contract means." Grauer contends that Jacobi said to him: "This means that you are getting $25,000. regardless of what happens." He added: "I will have Mr. Heymsfeld explain you the contract. After all, I am only a layman; I am not acquainted with legal phraseology; and Mr. Heymsfeld is a lawyer. He will explain you the contract." Grauer told Heymsfeld that he did not see anything about $25,000; that all he saw was $5,000 and the royalty on four million bottles, to which, so he said, Heymsfeld replied: "Of course you are selling it for $25,000 but you are only a layman, and you don't understand how to draw these contracts. We don't want anybody to know what we are doing, what we are paying for this."

The foregoing in outline is the plaintiff's version of what took place as the option agreement was executed.

The defendant's version is quite different. First of all, it must be observed that there is no reference in the written agreement to the sum of $16,000 or the sum of $9,000. That the sum of $25,000 was discussed is entirely possible, for the royalty of one-half of one per cent to be paid on each bottle stopper used would aggregate $20,000 and that sum, plus the $5,000, referred to in paragraph 3rd (a), would make the total of $25,000, but Jacobi denies that the royalty of $20,000 was to be paid unless the tops were used. As Jacobi says, his instructions to Heymsfeld were based on his agreement with Grauer to advance funds to the extent of $5,000 for an option on his patent, "the $5,000 to be used in the perfection of the stopper. Out of that we were also to employ and guarantee him ten weeks employment at $75 a week, * * *. The extent of our liability would be $5,000 up to the exercise of the patent." He also told Heymsfeld, following his talk with Grauer, that "any amount less than $5,000 that was expended in the perfection of the cap would be given to Mr. Grauer in full payment for the patent, plus a royalty of one-half per cent per bottle up to a maximum of 4,000,000 bottles when, as and if used."

These conversations, as related by Jacobi that he held with Grauer, followed by his instruction to Heymsfeld, are entirely consistent with the agreement on July 15th as prepared by Heymsfeld and as executed by the parties. The original draft required some changes following Heymsfeld's talk with the plaintiff, and plaintiff waited while the document was re-typed. Heymsfeld denied that he ever told the plaintiff that the agreement of July 15th meant that the plaintiff would receive the sum of $25,000 absolutely, or that he would receive the sum of $25,000 when the patents were sold by the plaintiff, and Heymsfeld denies that he ever interpreted the contract between the parties for the plaintiff. Later, at or about September 1st, when the patents were about to be assigned, the plaintiff's lawyer, Rubin, prepared a proposed assignment which was rejected by Heymsfeld as not being in conformity with the agreement of July 15th, for it contained a provision for the payment of $20,000 in addition to the sum of $5,000. The assignment as actually executed by the plaintiff, with the knowledge of the plaintiff's attorney, is an unconditional transfer of the plaintiff's entire right, title and interest in the patent to the defendant. There is no reference in that assignment, certainly not in terms, to the agreement even of July 15, 1936. When the assignment was delivered to the defendant, it gave the plaintiff its check for $4,340.02 with an accompanying letter. This letter the plaintiff accepted and confirmed without protest appearing thereon. Moreover, his undertaking with Jacobi for a year's employment from September 1, 1936, is not altogether consistent with the claim for $20,000 as an absolute obligation of defendant. Thereafter the plaintiff, in January and April 1937, received payments of royalties in the sums of $1,018.50 and $175.

Subsequently the patented device proved to be unsuccessful. Doubtless Grauer, like many other inventors, had every hope and perhaps expectation that it would prove successful; and such hope or expectation may have entered into his deliberation of the terms of the contract of July 15, 1936.

I conclude from all the evidence in the case that the agreement of July 15, 1936, fully expressed the agreement that the parties understood they were making. I think that the record shows that the plaintiff knew exactly what he was doing and that no grounds have been proved for reforming the instrument. That it received consistent practical interpretation is evidenced by the subsequent acts of the parties.

Nor can the plaintiff now be held to complain, for he accepted the benefits of the contract on September 1st and thereafter, and it was only when the defendant found the device unsatisfactory that he pursued first an action for breach of contract, which was abandoned; and then this action for reformation. The acceptance of benefits following the delay would seem to preclude him from the equitable remedy which he seeks. Texas Co. v. Rosenthal-Brown Fur Co., Inc., D.C. 1925, 12 F.2d 297; Id., 5 Cir., 16 F.2d 1022, certiorari denied 274 U.S. 746, 47 S.Ct. 658, 71 L.Ed. 1327; International Harvester Co. of America v. Rieke, 8 Cir., 9 F.2d 776; Miller v. Continental Shipbuilding Corporation, 2 Cir., 265 F. 158; Grymes v. Sanders, 93 U.S. 55; First National Bank v. Seldomridge, 8 Cir., 271 F. 561.

Moreover, as was said in a recently decided case, Equitable Life Assurance Society v. Aaron, 6 Cir., 108 F.2d 777, 778: "It is the general rule that, to authorize the reformation of written instruments, the decree must be supported by more than a mere preponderance of the evidence. The evidence must be clear, cogent and convincing, for there is always a strong presumption that the written instrument accurately sets forth the whole contract, and where fraud is charged he who asserts it has the burden of proving it by clear, unequivocal and convincing evidence because fraud is never presumed. This rule applies to the reformation of insurance policies as well as to any other written contract. It was said in Snell v. Atlantic F. & M. Ins. Co., 98 U.S. 85, 86, 90, 25 L.Ed. 52, that such evidence must be of the clearest and most satisfactory character. See also Equitable Life Assur. Soc. v. Johnson, 6 Cir., 81 F.2d 543, and Smith Bros. Properties Co. v. Ætna Life Ins. Co., 5 Cir., 62 F.2d 43."

The defendant may have judgment dismissing the complaint.